IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

INTEGRATED DIRECT MARKETING, LLC,          )
                                           )
            Plaintiff,                     )
                                           )
    v.                                     )          1:14-cv-1183 (LMB/IDD)
                                           )
DREW MAY and MERKLE, INC.,                 )
                                           )
            Defendants.                    )

## MEMORANDUM OPINION

Before the Court are multiple motions, including Defendant Merkle, Inc.'s Motion for

Summary Judgment ("Merkle's Motion for Summary Judgment"), Defendant Drew May's

Motion for Summary Judgment ("May's Motion for Summary Judgment"), and Defendant Drew

May's Motion to Strike Declarations and Other Material ("Motion to Strike"). For the reasons

that follow, Merkle's Motion for Summary Judgment will be granted, May's Motion for

Summary Judgment will be granted in part and denied in part, and May's Motion to Strike will

be denied. Also pending before the Court are plaintiff IDM's Motion to Compel Merkle, Inc. to

Respond to Plaintiff's Discovery Requests ("Motion to Compel"), Plaintiff Integrated Direct

Marketing, L.L.C.'s Motion in Limine for an Adverse Inference for Defendants' Spoliation of

Evidence and Other Relief ("Spoliation Motion"), and Plaintiff, [sic] Integrated Direct

Marketing, L.L.C.'s Motion for Sanctions for Defendants' Failure to Produce Documents,

Submission of a False Affidavit, and Refusal to Answer Questions at Deposition ("Motion for

Sanctions"). For the reasons that follow, plaintiff's Motion to Compel and Spoliation Motion

will be denied, and plaintiff's Motion for Sanctions will be granted in part and denied in part.

## I.    BACKGROUND

### A. **Procedural History**

Plaintiff Integrated Direct Marketing, LLC ("plaintiff" or "IDM") instituted this action against former employee Drew May ("May") for allegedly misappropriating IDM's confidential and proprietary information, including its trade secrets, and using that information to benefit himself and his new employer, Merkle, Inc. ("Merkle"). Almost six months after filing the initial Complaint, IDM filed an amended complaint, titled "Integrated Direct Marketing, LLC's First Amended Complaint Against Drew Many and Merkle, Inc., for Injunctive Relief, Damages, and Other Relief" ("Amended Complaint"), adding Merkle as a defendant. The Amended Complaint alleges seven causes of action. The first four, consisting of breach of contract (Count I), breach of fiduciary duty (Count II), conversion (Count III), and violation of the Arkansas and Virginia trade secrets acts (Count IV), were filed solely against May. Count V, which also alleges a violation of the Arkansas and North Carolina trade secrets acts, was filed solely against Merkle, and the last two counts of intentional interference with business expectancies (Count VI[1]); and unjust enrichment (Count VII[2]) were filed against both defendants.

In terms of relief, IDM seeks an injunction barring May and Merkle from engaging in any use of IDM's trade secrets and the confidential information May learned while employed with IDM; directing May and Merkle to return any documents or electronic files containing those trade secrets or confidential information; and enjoining May and Merkle "from engaging in future activities that would result in misappropriation of IDM's trade secrets and confidential proprietary information, including refraining from work on all accounts on behalf of Merkle that are in competition with IDM, including on data integration, campaign analytics, data sourcing,

---

[1] This count was improperly labeled as Count V in the Amended Complaint.

[2] This count was improperly labeled as Count VI in the Amended Complaint.

data pricing, and any other activities in which May and Merkle have retained, used, and may use, IDM's trade secrets and confidential and proprietary information." IDM also seeks compensatory and punitive damages, Merkle's disgorgement of any unlawfully obtained profits, and reasonable royalties for misappropriating IDM's information.

This action has been heavily litigated from the beginning due to the parties' failure to follow the Local Civil Rules and numerous discovery-related disputes which required endless motions hearings resulting in an almost three-month extension of discovery. Still pending is IDM's Motion to Compel, which seeks further discovery of Merkle's financial information in relation to IDM's unjust enrichment claim and damages theory. That motion has been held in abeyance pending the outcome of summary judgment. In addition, upon the defendants' motions, IDM's two damages experts were stricken from this case because they were not timely disclosed. See Order of April 13, 2015 [Dkt. No. 113] (magistrate judge's order); Order of May 1, 2015 [Dkt. No. 162] (Order affirming the magistrate judge's ruling). Accordingly, IDM has no expert to testify at trial about its damages. Also still pending are plaintiff's Spoliation Motion, which accuses May and Merkle of spoliating evidence, and plaintiff's Motion for Sanctions, which was filed against both defendants on multiple grounds. After hearing argument on both motions, including live testimony from May on the spoliation issue, the Court declined to rule on those motions.

Following the close of discovery and after hearing oral argument on plaintiff's Spoliation Motion and Motion for Sanctions, each defendant filed a motion for summary judgment. Subsequently, May moved to strike certain exhibits attached to IDM's brief in opposition to his summary judgment motion. All three motions were fully briefed and a hearing was held on August 21, 2015. During that hearing, the Court granted summary judgment in favor of May on

the breach of contract claim (Count I), which alleged that May breached Paragraph 2 of his Confidentiality Agreement with IDM.  Paragraph 2 indefinitely prohibited May from disclosing any of IDM's confidential information to any third party.  "Confidential information" was defined as "any and all information furnished by" IDM that is not publicly known.  As May argued, the breadth of that definition made that clause unenforceable.  For example, it would prevent May from ever disclosing information such as the identity of IDM's janitor services vendor.  Accordingly, the Court ruled that the confidentiality provision was not narrowly tailored to protect IDM's legitimate business interests, thereby rendering it unenforceable under Virginia law.[3]  See Assurance Data, Inc. v. Malyevac, 747 S.E.2d 804, 808 (Va. 2013) (reiterating the principle that an agreement that restrains competition or trade must be "no greater than necessary to protect a legitimate business interest," "not unduly harsh or oppressive in curtailing an employee's ability to earn a livelihood," and "reasonable in light of sound public policy"); Lasership Inc. v. Watson, 2009 WL 7388870, at *8, 79 Va. Cir. 205 (Aug. 12, 2009) (finding a confidentiality agreement overbroad because it precluded the disclosure of any information concerning the business to any person in perpetuity, including information not "worthy of confidence"); see also BB&T Ins. Servs., Inc. v. Thomas Rutherfoord, Inc., 2010 WL 7373709, at *5, 80 Va. Cir. 174 (Va. Cir. Feb. 9, 2010) (confidentiality clause unenforceable because its duration was "for perpetuity").  Moreover, even if Paragraph 2 were enforceable, IDM failed to produce any evidence of actual damages resulting from May's alleged breach, which is an essential element of a breach of contract claim.  See Sunrise Continuing Care, LLC v. Wright, 671 S.E.2d 132, 135 (Va. 2009).

---

[3] The Confidentiality Agreement contained a choice of law provision selecting Virginia law to govern, and no party disputed the validity or applicability of that choice of law provision.

The remainder of the issues raised in the parties' summary judgment motions, as well as during the August 21 hearing, are addressed in this Opinion.

### B. Factual Background

Both IDM and Merkle are engaged in the data-driven marketing business. IDM provides data solutions, analytics, and strategies to technology and retail companies for their business-to-business ("B2B") and business-to-consumer ("B2C") marketing needs. See Decl. Slater Supp. Pl.'s Opp'n to Merkle's Mot. Summ. J. ("Slater Decl. Opp'n MSJ") ¶ 3. IDM's principal place of business is in Reston, Virginia. Its focus is to help its clients achieve their customer acquisition and retention goals, as well as their sales goals. Id. Two key areas of IDM's business are data sourcing and customer data integration ("CDI"). Id. ¶ 4. "Data sourcing involves selecting and acquiring the best data for each [data] solution, including drawing from large data providers to hundreds of niche sources in order to build the greatest depth and accuracy at the best value." Id. "CDI involves matching various data sources using special processes to provide a dataset that has no errors or duplications." Id. ¶ 5; see also Decl. Brian Wiedower ("Wiedower Decl.") ¶ 5 (explaining that CDI is the process of consolidating and managing customer information from multiple data sources). CDI is an element of customer relationship management ("CRM") for companies and enables a company to maximize the success of a marketing campaign using customer data. Id.

Merkle's principal place of business is in Columbia, Maryland. It provides data solutions, analytics, and strategies to businesses in support of their B2B and B2C marketing. Both IDM's and Merkle's businesses involve procuring custom data for clients from external data sources and combining it with client internal data to produce custom data-based CRM programs. Both companies compete to provide their data-integrated CRM services to high-tech businesses.

May, a resident of Arkansas, was hired by IDM in January 2012, J. Stip. [Dkt. No. 188] ¶ 5, to open IDM's Little Rock, Arkansas office, see Slater Decl. Opp'n MSJ ¶ 6. May had known Chad Slater ("Slater"), IDM's President and CEO, since 1997 or 1998 through their mutual employment at Acxiom. See IDM Dep. 39, 281. While he was at IDM, May served as the Executive Vice President for Data Integration. On March 11, 2014, IDM terminated May's employment. J. Stip. ¶ 5. Although May signed a Confidentiality Agreement with IDM early on in his employment, he declined to execute the Confidential Separation and Non-Disclosure Agreement that IDM presented to him upon his termination. Id. ¶¶ 7-8. May was clearly unhappy about his separation from IDM, as evidenced by inflammatory text messages he sent after he was terminated, which included statements that he was "[w]aiting on a few job offers to decide to take job [sic] or just steal all of IDM's clients and hire the team in LR [Little Rock] just to f them" and that he could "absof---inglutely" "poach IDM'ers." Decl. Darin D. Thomas Supp. Renewed Mot. Compel Merkle and May ("Thomas Decl.").

On April 29, 2014, May accepted employment with Merkle and began working at Merkle on May 5, 2015. J. Stip. ¶¶ 9, 11. May was hired as a Vice President and Client Partner in the "High Technology/B2B Vertical Markets Group." Id. ¶ 12. Upon learning of May's new employment, IDM's counsel sent letters on May 7, 2014, to both May's attorney at the time (John Coulter) and Merkle's CEO (David Williams) stating that "IDM is closely monitoring this situation in light of the fact that Mr. May is now employed by Merkle, a competitor of IDM, and IDM will aggressively pursue legal action against Mr. May and Merkle in the event IDM becomes aware of a breach of the [Confidentiality] Agreement."

Almost two months later, IDM's counsel reached out to Merkle's general counsel, Beverly Rubin, to express its concern over May working on Merkle's account with Dell, a large

client of both IDM and Merkle. In mid-July 2014, Rubin discussed IDM's concerns with May. See Rubin Aff. ¶¶ 12-19 [Dkt. No. 256-1].[4] During this conversation, May informed Rubin that he had backed up information from his IDM computer onto a personal external hard drive from time to time but "that he did not think he had any IDM information on his personal hard drive, yet he was unsure." Id. ¶ 15. May asked what he should do if he did still have IDM information on his hard drive, and Rubin "made it clear to him that [she] did not want any IDM information here at Merkle. [She] further indicated that he needed to continue to comply with his confidentiality obligations to IDM." Id. ¶ 16.

As it turned out, May had in fact retained a large amount of IDM files on his personal external hard drive following his departure from IDM. See Report on Digital Forensic Examination ("Ball Rep.") 3-9 (Apr. 8, 2015). Based on an examination of the hard drive by IDM's forensic computer expert, Craig Ball ("Ball"), it was determined that May retained possession of many IDM files long after he was fired from IDM and that he later attempted to delete those files from his external hard drive on four separate occasions: July 16, September 7, September 19, and September 22, 2014. See id. The latter two deletions occurred after the original Complaint was filed on September 8, 2014. Based on this evidence, May violated Paragraph 9 of his Confidentiality Agreement, which required that a terminated employee return any and all IDM property or destroy it upon IDM's direction.[5] Despite the deletions, it appears

---

[4] Rubin's affidavit was submitted in opposition of IDM's Spoliation Motion, which, among other things, accused Merkle of instructing May to spoliate evidence that was on his external hard drive. Rubin's affidavit was submitted to the Court in its entirety in camera, and a redacted version was filed publicly and produced to IDM to protect the privileged communications contained therein. In the interest of providing a coherent Opinion, a limited portion of those previously-redacted portions of Rubin's affidavit will be reproduced here.

[5] Paragraph 9 states:

Return of Materials and Equipment. Upon termination of employment with the Company, or upon request at any time by the Company, Employee shall

from Ball's report that much of the information has been recovered, as Ball was able to list file names and access dates. See id.

In opposing summary judgment, IDM cites numerous examples of what it claims are instances of May and Merkle misappropriating IDM's confidential and proprietary information, including its trade secrets, particularly in light of the IDM files May retained on his external hard drive. The core argument in defendants' summary judgment motions is that there is insufficient evidence that either of them used or benefitted from any IDM information May retained and that none of the information specified by IDM qualifies as a trade secret. They also attack the lack of any evidence of IDM being actually damaged by either defendant's conduct.

## II.    MOTIONS FOR SUMMARY JUDGMENT

### A. **Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the initial burden of showing the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the movant files for summary judgment and provides evidentiary support for the motion in accordance with Fed. R. Civ. P. 56(c), "the nonmoving party must come forward with specific facts showing that there is

immediately return to the Company, or destroy at the Company's direction, any and all equipment, documents, materials, electronically stored information and other information or property of the Company in Employee's possession or control, including all documents and files, and all equipment and peripherals. . . . In addition, Employee hereby acknowledges that upon termination of employment, or upon request at any time by the Company, Employee may not access or utilize, or attempt to access or utilize, any Company computer system or network or database or any Confidential Information or client confidential information.

Although it appears that May violated Paragraph 9, Count I of the Amended Complaint only alleged that May breached Paragraph 2 (the confidentiality provision) and IDM never moved to amend that count. Therefore, Paragraph 9 was not considered when summary judgment was granted in May's favor on the breach of contract claim.

a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted) (emphasis in original).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[W]hen considering a motion for summary judgment, the district court must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion;" however, "those inferences must, in every case, fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995) (internal quotation marks and citation omitted).

"While it is axiomatic that Rule 56 must be used carefully so as not improperly to foreclose trial on genuinely disputed, material facts, the mere existence of some disputed facts does not require that a case go to trial." Id.; see also Anderson, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient . . . .").  Accordingly, to survive a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." Id.; see also Poole v. Pass, 351 F. Supp. 2d 473, 478 (E.D. Va. 2005).  "Thus, if the evidence is 'merely colorable' or 'not significantly probative,' it may not be adequate to oppose entry of summary judgment." Id. (quoting Anderson, 477 U.S. at 249-250).

### B. **Local Civil Rule 56**

As an initial matter, IDM does not specifically contest the lists of numbered undisputed material facts in each defendant's memorandum in support of summary judgment.  Instead, IDM states in a footnote in its opposition briefs that it "disputes all of May's [and Merkle's] 'Undisputed' Material Facts (save for the stipulated facts filed with the Court).  The facts the

9

[sic] May [and Merkle] has recited are not in the light most favorable to IDM and are disputed for the reasons set forth herein." Pl.'s Opp'n to May's Mot. Summ. J ("Pl.'s Opp'n May's MSJ") 1 n.1; Pl.'s Opp'n to Merkle's Mot. Summ. J. ("Pl.'s Opp'n Merkle's MSJ") 3 n.2. IDM then presents its own version of the facts in narrative format, including citations to its exhibits, rather than in list format, and does not identify which facts, if any, are in dispute.

Defendants argue that IDM's opposition briefs do not comply with Local Civil Rule 56(B), which states: "A brief in response to such a motion [for summary judgment] shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute." Local Civ. R. 56(B). Defendants further argue that the Court should accept their lists of undisputed facts as admitted due to IDM's failure to comply with the local rule. See Local Civ. R. 56 ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine facts in opposition to the motion.").

In support, defendants cite Lake Wright Hospitality, LLC v. Holiday Hospitality Franchising, Inc., No. 2:07-cv-530, 2009 WL 2606254 (E.D. Va. Aug. 20, 2009), and JDS Uniphase Corp. v. Jennings, 473 F. Supp. 2d 705 (E.D. Va. 2007), among other cases, in which courts in this district have adopted the moving party's list of undisputed facts because the non-moving party failed to comply with Local Civ. R. 56(B). In Lake Wright, rather than listing all material facts contended to be in dispute, the plaintiff "set forth its own counterstatement in the 40-page body of its opposition, and then included . . . a separate 'summary of disputed facts' indexed to the numbered paragraphs of defendants' list of undisputed facts as Exhibit 1 to its

opposition." Id. at *3. In addition, the "plaintiff's counterstatement contain[ed] literally dozens of paragraphs that are (A) argument, which has no place in the facts section of an opposition, (B) factual contentions unsupported by citations to record evidence, in violation of this court's Local Civil Rule 56(B), (C) misleading statements, and (D) outright misrepresentations." Id.

Similarly, in JDS Uniphase, the court found that the party moving for summary judgment, the counterclaim-defendant, "submitted a properly captioned statement of undisputed facts with appropriate record citations" but the counterclaim-plaintiff "responded with a narrative that did not identify with any specificity which facts, if any, were disputed." JDS Uniphase, 473 F. Supp. 2d at 707. The court concluded, "In these circumstances Local Rule 56(b) dictates that the Court may 'assume that facts identified by the moving party in its listing of material facts are admitted.' Accordingly, [the counterclaim-defendant's] statement of material facts is properly deemed to be undisputed." Id.

As in Lake Wright and JDS Uniphase, IDM's narrative version of its own interpretation of the facts fails to comply with Local Civil Rule 56(B), largely contains argument, and makes it difficult to determine exactly which material facts are disputed. Moreover, because of the way IDM responded to defendants' uncontested facts, it effectively denied many obviously uncontestable facts listed by May, such as:

> IDM procures data from third-party vendors, reformatting the data to suit the needs of IDM's clients, and then selling the reformatted data to its clients. Def. May's Mot. Summ. J. ("May's MSJ") 2 (undisputed material fact ("UMF") # 1).

> May has over 25 years of experience in the marketing services industry, starting at Acxiom Corporation ("Acxiom"), a company that sources, manipulates and maintains information on potential consumers and provides strategic marketing advice to its clients. Id. at 3 (UMF # 3).

> During his employment with IDM, May worked with a total of six clients: Dell, Google, JC Penney, Home Depot, Stage Stores, and Northern Tool & Equipment. Id. (UMF # 6).

> May possessed an external hard drive contained [sic] over a million files at the
> time it was forensically copied on September 25, 2014. Id. at 4 (UMF # 9).

The same is true for at least some of Merkle's listed uncontested facts:

> Merkle was formed in 1983, and acquired by David Williams, the present CEO, in
> 1988. Def. Merkle's Mot. Summ. J. ("Merkle's MSJ") 1 (UMF # 6).

> Dell has been a client of Merkle since 2000. Id. (UMF #7)

> Google has been a client of Merkle since 2012. Id. at 2 (UMF # 8).

> It is IDM's allegation that Mr. May thereafter disclosed to Merkle information
> belonging to IDM.  In answer Merkle's First Interrogatories, IDM identified
> certain documents in support of this allegation. Id. (UMF # 10) (citing IDM's
> Responses to Merkle's First Interrogatories).

Accordingly, IDM's opposition briefs do not demonstrate a good faith effort to

specifically identify which material facts are genuinely in dispute.  Therefore, all uncontested

facts listed in defendants' opening briefs but not contested by IDM in its argument sections are

deemed admitted.  Moreover, any new facts included in IDM's narrative fact sections but not

specifically discussed within the context of its arguments will not be considered as establishing

anything.

### C. **Preemption Under the Arkansas Trade Secrets Act**

Defendants argue that the Arkansas Trade Secrets Act ("ATSA"), and specifically Ark.

Code Ann. § 4-75-602 (West), preempts IDM's non-contract claims regarding any of its

confidential and proprietary information, even if that information does not qualify as a trade

secret.  That statutory provision states:

> (a) This subchapter displaces conflicting tort, restitutionary, and other law of this
> state pertaining to civil liability for misappropriation of a trade secret.

> (b) This subchapter does not affect:
>> (1) Contractual or other civil liability or relief that is not based upon
>> misappropriation of a trade secret; or
>> (2) Criminal liability for misappropriation of a trade secret.

12

Ark. Code Ann. § 4-75-602 (West). IDM responds that a jury must first decide whether any of the information at issue constitutes a trade secret before the preemption issue can be decided. IDM also argues that the ATSA does not preempt tort claims arising under the law of other states, and further argues that all of its tort claims in fact arise under other states' laws.

After reviewing the cases cited by the parties, the Court is not persuaded by defendants' arguments that the determination of whether the ATSA preempts IDM's tort claims should be made at this time. Although the cases upon which the defendants rely demonstrate that the preemption issue may be decided before trial and that the ATSA may preempt tort claims even if the information underlying those claims is ultimately found not to qualify as a trade secret, each of those cases relies upon a single case from the Arkansas Supreme Court which does not appear to stand for as broad a proposition as defendants assert.

In that case, the Arkansas Supreme Court interpreted the preemption provision for the first time and found that, "[a]s a general rule, courts examine whether the claim is based upon the misappropriation of a trade secret. If so, the displaced claim must be dismissed." R.K. Enter., LLC v. Pro-Comp Mgmt., Inc., 158 S.W.3d 685, 689-90 (Ark. 2004). The court then concluded that the ATSA "displaces or preempts the award of damages based upon tort claims for conversion of trade secrets, as well as other tort claims such as conspiracy, that may arise under a claim for misappropriation of trade secrets." Id. at 690. In reaching that conclusion, the court favorably quoted the following from a prior federal district court case interpreting the ATSA's preemption provision:

> [W]ere the Court to determine that the information [the plaintiff] seeks to protect as a trade secret qualified as such, and that the Defendants misappropriated those trade secrets, then [the plaintiff's] exclusive remedy for improper use of that information would be pursuant to the Arkansas Trade Secrets Act. In that situation, [the plaintiff] would not be able to rely on the acts constituting misappropriation of a trade secret to support its other causes of action. That

13

> situation does not arise here, however, because the Court concludes that the information that [the plaintiff] seeks to protect as a trade secret is not entitled to protection as such under the Arkansas Trade Secrets Act.

Id. at 689 (emphasis added) (quoting with approval Vigoro Indus., Inc. v. Cleveland Chem. Co. of Ark., 866 F. Supp. 1150, 1161 (E.D. Ark. 1994), aff'd in part, rev'd in part on other grounds sub nom., Vigoro Indus., Inc. v. Crisp, 82 F.3d 785 (8th Cir. 1996)). Under this analysis, IDM's tort claims would not be preempted to the extent that they may relate to information that does not qualify as a trade secret. Because the preemption issue need not be decided until a determination is made that there are in fact trade secrets involved in this action, the question of whether the ATSA preempts claims arising under other states' laws need not be addressed at this junction.

### D. Trade Secrets Claims

In Counts IV[6] and V, IDM raises claims against both defendants for violating the Arkansas Trade Secrets Act. Under the ATSA, a plaintiff may recover damages for any actual loss it suffers caused by misappropriation and for the defendant's unjust enrichment derived from the misappropriation "that is not taken into account in computing damages for actual loss." Ark. Code Ann. § 4-75-606 (West). In addition, "[a]ctual or threatened misappropriation may be enjoined." Ark. Code Ann. § 4-75-604 (West). "Misappropriation" is defined as:

> (A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> (i) Used improper means to acquire knowledge of the trade secret; or

---

[6] In the Amended Complaint, Count IV also includes a claim against May for violating the Virginia Uniform Trade Secrets Act ("VUTSA"). In opposing May's motion for summary judgment, IDM only applies the ATSA to May and apparently abandoned any claim under the VUTSA. See Pl.'s Opp'n May's MSJ 17 n.13 ("The great weight of Arkansas trade-secret authority, which governs this claim, shows that findings of trade-secret status are determined at trial . . . ." (emphasis added)).

(ii) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
    (a) Derived from or through a person who had utilized improper means to acquire it;
    (b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
    (c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake;

Ark. Code Ann. § 4-75-601(2) (West).

"Trade secret" is defined as "information, including a formula, pattern, compilation,

program, device, method, technique, or process," that:

(A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ark. Code Ann. § 4-75-601(4) (West).  Lastly, "improper use" is defined as "theft, bribery,

misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage

through electronic or other means."  Ark. Code Ann. § 4-75-601(1) (West).

"In addition to the statute, [the Arkansas] supreme court has endorsed a six-factor

analysis in determining whether information qualifies as a trade secret:  (1) the extent to which

the information is known outside the business; (2) the extent to which the information is known

by employees and others involved in the business; (3) the extent of measures taken by the

company to guard the secrecy of the information; (4) the value of the information to the company

and to its competitors; (5) the amount of effort or money expended by the appellee in developing

the information; and (6) the ease or difficulty with which the information could be properly

acquired or duplicated by others." LaPointe v. New Tech., Inc., 437 S.W.3d 126, 130 (Ark. Ct. App. 2014) (citing Saforo & Assocs., Inc. v. Porocel Corp., 991 S.W.2d 117 (Ark. 1999)).

"Information must meet both the ATSA definition and all of the six Saforo factors in order to qualify as a trade secret." Wal-Mart Stores, Inc. v. P.O. Mkt., Inc., 66 S.W.3d 620, 630 (Ark. 2002). Furthermore, "the [Arkansas] supreme court [has] made it clear that a company must make reasonable efforts to restrict postemployment disclosure of confidential information for that information to be a trade secret." Id. (citations omitted).

To survive summary judgment on its trade secret claims, IDM must come forward with evidence from which a reasonable jury, drawing all reasonable and not merely speculative inferences in IDM's favor, could return a verdict for IDM. See Matsushita, 475 U.S. at 587; Anderson, 477 U.S. at 248; Thompson Everett, 57 F.3d at 1323. Moreover, summary judgment is appropriate for any claim for which IDM has failed to proffer evidence supporting each element of that claim, provided defendants have moved for summary judgment on that basis. See Celotex, 477 U.S. at 323-24 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ."). IDM has identified the following as the trade secrets misappropriated by May and Merkle.

### 1. Google Brazil Pricing

IDM claims May disclosed to Merkle IDM's pricing information in connection with a proposal Merkle was preparing for Google work in Brazil, which both Merkle and IDM were competing to win. IDM's theory is that Merkle employees got May to disclose IDM's trade secret pricing information which enabled Merkle to underbid IDM, causing Google to select Merkle for the Google Brazil project before IDM could submit its final proposal to Google. To support this claim, IDM relies on an e-mail chain among a handful of Merkle employees that took place during May's first week with Merkle. See May 11, 2014 Revised Numbers E-mail.

The e-mail circulated Merkle's draft costs for its forthcoming proposal to Google. May's sole statement in this e-mail chain was: "Not that I have a ton to add here, but will the client have an issue on the $148 a lead number?" Id. Michael Donovan, a Merkle employee, responded:

- Drew – anything you can tell us about what worked well/not well in IDM's pricing approach? Are there things we should add in that we might now [sic] be considering?
- I agree with Drew's comments about $148, but at the same time, Intl data costs (and results) are WAY more expensive than in the US.

Id. There is no evidence of any further response from May to this e-mail. Instead, the original sender, Karen Caulfield, asks Chandos Quill a couple days later to review and finalize the pricing, to which Quill responds, "Hi Karen I have reviewed and updated the lead pricing. It came down some." Id. Merkle's final price per lead was $140.50.

Based on this e-mail exchange, IDM argues that "May had IDM's Google pricing scheme and latest contract status;" "he told the Google team their price per lead was too high;" Donovan "asked May to divulge IDM's pricing strategy for its Google work;" "[t]here were a series of communications over the weekend regarding Merkle's pricing strategy to Google;" and "by the end of the weekend 'the price came down some,' not coincidentally to just $1.50 per lead lower than IDM's pricing for Google." Pl.'s Opp'n May's MSJ 21. IDM purports that its "price for Google work is $142[7] per lead in North America," Pl.'s Opp'n Merkle's MSJ 12 (citing Slater Decl. Opp'n MSJ ¶ 17), although that figure was never revealed by IDM during discovery.

At some point after Merkle submitted its bid for the Google Brazil work, Google stopped communicating with IDM about the project. IDM Dep. 53-54, 65. As a result, IDM never finalized and submitted its own proposal for the Google Brazil work. See id. IDM's damages

---

[7] Although the $142 figure was filed under seal, IDM's counsel revealed that figure in open court numerous times during the August 21 hearing. See Tr. Mots. Hr'g ("Tr. Aug. 21 Hr'g") 7:9, 7:17, 20:7, 20:15, 20:19 (Aug. 21, 2015). Accordingly, that figure will not be kept sealed in this Opinion.

theory relating to the alleged misappropriation of its pricing information is that May revealed IDM's price for Google North America, enabling Merkle to underbid IDM on Google Brazil, leading to Merkle winning the Google Brazil work and thereby being unjustly enriched by that win.

Although the parties seem to agree that Donovan should not have asked May about IDM's pricing approach, defendants argue that there is no evidence in the record that May ever responded to Donovan's inquiry and, accordingly, no evidence that Merkle used any such information in formulating its final proposal for the Google Brazil work.  In his deposition, May testified that later the next week, he spoke with Donovan over the telephone and said something to the effect of "probably shouldn't have done that."  May Dep. 355-56.  May elaborated that he said this because Donovan's inquiry would have required May to disclose confidential and proprietary pricing information of IDM.[8]  Id. at 357-58.

---

[8] Specifically, the following exchange occurred in May's Deposition:

> **Q:** Do you recall being asked by Michael Donovan in an email about what worked well and didn't work well with IDM's pricing?
>
> . . .
>
> **May:** Yes.
>
> . . .
>
> **Q:** Did you say anything to Michael Donovan about that?
> **A:** I don't recall if I specifically did, other than something to the effect of that wasn't -- you know, probably shouldn't have done that.
> **Q:** Probably shouldn't have done that. That's not in an email?
> **A:** No.
> **Q:** So are you saying that you had some phone conversations with him?
> **A:** I think it was later that next week, I had some phone conversation or a phone conversation with him.
>
> . . .
>
> **Q:** So the following week, you think you called him up and you said to him, you probably shouldn't have said that in the email?
> **A:** I didn't say that I called him up. I said that we spoke. And that was a brief topic of discussion.
>
> . . .

Donovan was also deposed, during which he stated that May never responded to his inquiry and never gave him any information regarding Merkle's pricing proposal for the Google Brazil work. Donovan Dep. 130-31. In addition, Quill stated in her deposition, "I was responsible for pricing and I didn't use it." Quill Dep. 31. The parties have not attached the previous page of Quill's deposition containing the particular question posed, but Merkle states in its reply brief that the above-quoted response from Quill was in reference to Merkle's proposed Google Brazil pricing and whether she used any information from May. See Merkle's Reply

---

**Q:** I'm trying to get the context in which you and he were speaking, and this topic came up?

**A:** I mean, I don't remember what the specific topic was for us to talk about.

. . .

**Q:** So do you recall if you called him or he called you?

**A:** I don't remember.

**Q:** Okay. But you do remember saying to him that it probably wasn't a good idea for him to use those words in the email?

**A:** I recall having that conversation with him. Yes.

**Q:** Why did you say that to him?

**A:** Because, I mean, that specific request is, you know, proprietary and confidential.

May Dep. 354-58 (emphasis added).

IDM repeatedly characterizes this entire deposition exchange as May "telling Donovan not to put that evidence in writing in the future." Pl.'s Opp'n Merkle's MSJ 2; see also id. at 12 ("May took steps to cover up his disclosures of IDM's confidential information to Merkle by calling Donovan and telling him that he should not have made that request in a written e-mail because it was evidence that Donovan was requesting proprietary and confidential IDM information."); id. at 23 ("May then called up Donovan and told him he shouldn't put stuff like that in writing because it was IDM confidential and proprietary information." (emphasis added)); id. ("[I]t is also rational for a jury to infer that May's telephone conversation with Donovan advising him to not put anything in writing is highly probative of a cover up.").

In opposing May's motion for summary judgment, IDM purports to quote May directly as saying not to put such things in writing; however, IDM provides no citation and appears to be poorly paraphrasing, not quoting, May's deposition testimony. See Pl.'s Opp'n May's MSJ 11 ("May has . . . told others to 'not put stuff in writing.'"); see also id. at 21; Tr. Aug. 21 Hr'g 12 (IDM's counsel stating "He said: Don't put anything in writing."); id. at 21. Contrary to IDM's argument, none of the materials cited by IDM contains statements by May telling anyone at Merkle not to put things in writing.

Supp. MSJ 8.  Therefore, there is no direct evidence that May disclosed any IDM pricing information to anyone at Merkle in connection with Merkle's Google Brazil bid.

Although there is no direct evidence of such a pricing disclosure, if IDM can point to reliable evidence in the record that Merkle in fact dropped the price in its Google Brazil bid to just below a known-IDM price, following Donovan's inquiry, that might be sufficient circumstantial evidence to create an issue of fact precluding summary judgment, given that a jury would be entitled to find that pricing information in this context could constitute a trade secret. IDM, however, has produced no such evidence.  Instead, IDM has proffered, in a very problematic declaration by Slater submitted for the first time in opposing summary judgment, that its price for Google work in North America is $142 per lead and that May knew that price based on his work for Google while employed by IDM.  See Slater Decl. Opp'n MSJ ¶ 17. There is no further explanation in Slater's declaration or in IDM's summary judgment opposition briefs of where this $142 figure comes from or why it was not specifically revealed during discovery, despite Slater being deposed for two full days in both his individual capacity and as the corporate designee for IDM.

Indeed, when Slater testified as IDM's corporate designee, he repeated numerous times that IDM did not use a price per lead pricing system and that he could not give defendants' attorneys any estimated price per lead for work IDM had done for Google.  For example:

> **Q:** I'm talking about internally you floated a price per lead of $148 price per lead?
> **IDM:** I don't know how I can be more clear to you that we do not talk about programs on a price per lead basis, and we did not submit a proposal for Google Brazil.

IDM Dep. 65.  IDM was then asked whether it had ever performed work in Brazil for Google:

> **IDM:** We've done tests, and we've done proof of concepts, and we've looked at data for them in Brazil, yes.

20

> **Q:** Okay. Do you remember what the price per lead was for the proof of concepts that you did, that IDM did, for Google Brazil?
>
> **A:** I guess we're going to be here all day. You keep asking me price per lead. I'll answer it again, which we do not price anything to Google on a price per lead basis.
>
> **Q:** You've heard your counsel talk about $148 price per lead per that email we just were talking about. You're saying that has nothing to do with the way IDM does business; correct?
>
> **A:** No. You're speaking very broadly. Using something very specific and going broadly with it; right?
>
> **Q:** Okay. Well, tell me how you can or cannot answer that question.
>
> **A:** Can you read the question back or restate it?
>
>     (Whereupon, the reporter read the record as requested.)
>
> **A:** So that's why I can't. It has nothing to do with the way that we do business.

IDM Dep. 68-69.

Contrary to Slater's deposition testimony, IDM now insists that it has used a price per lead of $142 for Google work and that Merkle reduced its bid to $140.50 to undercut IDM. In his declaration, Slater backtracks on his deposition testimony by explaining that "the price per lead generated is always inherently incorporated into such proposals, and price per lead can be readily calculated from a total cost of the bid by simple mathematics." Slater Decl. Opp'n MSJ ¶ 16. Slater then states, "IDM's price for Google work is [$142[9]] per lead in <u>North America</u>. May knew by virtue of his work with IDM, including his work on Google for IDM, that IDM's price for Google work is [$142] per lead." <u>Id.</u> ¶ 17 (emphasis added). IDM does not explain why Slater was able to identify the $142 price per lead in his declaration filed in opposition of summary judgment when he could not give even an estimated price per lead during his depositions. Moreover, the $142 figure is stated in connection with Google North America. Most confusing was that during IDM's deposition, Slater "conceded that if [its] unsubmitted proposal for work in Brazil had been sent to Google, the price per lead would have been

---

[9] The $142 figure was redacted in Slater's declaration; however, because IDM's counsel revealed that figure in open court numerous times, it will be unsealed in this Opinion.

calculated at $11.20." Merkle's Reply Supp. MSJ 9 (citing IDM Dep. 74-75). At the August 21 hearing, IDM's counsel explained that the $11.20 price per lead was not a comparable figure because it was a discounted price that IDM charged Google for a test performed in Brazil in an attempt to win the larger Google Brazil contract. See Tr. Aug. 21 Hr'g 20-21. Therefore, no evidence has been presented as to what pricing IDM was considering using in its never-finalized proposal for the Google Brazil project.

At the August 21, 2015, hearing, IDM explained for the first time that the $142 figure is derived from Statements of Work ("SOWs") between IDM and Google for work in North America which were purportedly produced by IDM in discovery but have not been presented to the Court. IDM's counsel claimed, without citing to record evidence, that May retained possession of those SOWs after he began working for Merkle and could have calculated the $142 price per lead from them and thereby disclosed that figure to Merkle. See Tr. Aug. 21 Hr'g 20. Despite having enlisted a forensic computer expert to examine May's external hard drive, who then reported on the files retained on May's hard drive after his termination date, IDM has not cited to any evidence from that expert showing that May in fact retained the SOWs at issue, nor has IDM submitted those SOWs to the Court as evidence of its claim that it used a $142 price per lead for its Google North America work. Without such evidence, Slater's eleventh hour declaration, devoid of any explanation of the basis for that figure, does not provide adequate evidence from which a reasonable jury could find in favor of IDM's price-undercutting theory. Accordingly, summary judgment will be granted for the defendants to the extent this claim is raised under the ATSA.

In addition to IDM's claim under the ATSA against both defendants, IDM argues that it also has a claim against Merkle under the North Carolina Trade Secrets Protection Act

("NCTSPA") based on the same price-undercutting allegations because Donovan was working at Merkle's location in North Carolina when he sent the e-mail asking May about pricing. See Pl.'s Opp'n Merkle's MSJ 22 n.17. Assuming IDM can bring a claim under the NCTSPA, the same conclusion results because the substantive state law does not change the summary judgment standard in Fed. R. Civ. P. 56, as applied by federal courts. Merkle has put forth substantial evidence that it did not receive or use any IDM pricing information in preparing its Google Brazil bid. The sole evidence IDM has put forth is Slater's "own, self-serving and conclusory affidavit," without any corroborating evidence, which "is insufficient as a matter of law to counter [Merkle's] substantial evidence . . . and to stave off summary judgment." Malghan v. Evans, 118 F. App'x 731, 733 (4th Cir. 2004). Therefore, this claim fails.

2. IDM's Fuzzy Matching CDI

IDM's next trade secret misappropriation claim focuses on a telephone conversation between Brian Wiedower ("Wiedower"), who was then IDM's Director of Data Integration, and Joseph Tobey ("Tobey"), who is Merkle's Director of DataSolutions Operations. Specifically, IDM alleges that during May's second week at Merkle, he set up a conference call for May 15, 2014, between Wiedower and Tobey, during which Wiedower disclosed IDM trade secret information to Tobey. It is undisputed that this telephone conference occurred and that the participants discussed Alteryx, a commercially available software package that anyone may purchase. Alteryx can be used to perform data hygiene and data analytics, see Decl. Joseph Tobey ("First Tobey Decl.") ¶ 3 (June 14, 2015), and can be utilized for customer data integration, see Wiedower Decl. ¶ 4. Alteryx comes with built-in features, including its Fuzzy Matching Tool which can be used to identify similar records from multiple data sources.[10] See

---

[10] See also Tools in the Alteryx Designer at 4, http://www.alteryx.com/sites/default/files/alteryx-designer-tools-sheet_0.pdf, which describes the Fuzzy Matching Tool as used to "[i]dentify non-

First Tobey Decl. ¶ 6. Alteryx can also be customized for a user's needs through programming. See Wiedower Decl. ¶ 4.

The only evidence IDM provides as to its claim that trade secret information was revealed in this conversation are a declaration from Wiedower and a May 13, 2015, e-mail from Merkle employee Scott Cone ("Cone") to Tobey.[11]  In that May 13 e-mail, Cone asked Tobey the following:  "Joe – do we have a copy of Alteryx in house?  Maybe that can help the company name matching problem that Thomas and Steven are working on for google." MERKLE_000054. Apparently on the same day, May set up a conference call for May 15 between Wiedower and Tobey. See Wiedower Decl. ¶ 10. May also sent Wiedower an e-mail invitation to the conference call on the morning of May 15. See id. Ex. A. According to Wiedower's declaration:

> While I was employed at IDM, Drew May, who had since become an employee of Merkle, called me on or about May 13, 2014. Drew May told me that Merkle needed help with its problem of performing string matching or fuzzy matching in the Alteryx tool. Drew May asked me to talk to a Merkle employee and help Merkle solve this problem, via conference call, two days later, on May 15, 2014. Wiedower Decl. ¶ 10.

> On the conference call, I helped resolve Merkle's string matching configuration problem, using Alteryx. Id. ¶ 11.

---

identical duplicates in a data stream." Id.  This document, available on Alteryx's website, further explains that this tool helps "determine similarities in your data." Id.  For example, if you have two different data sets, the name and address of the same individual may appear in both data sets but they may appear slightly differently.  See id.  The Fuzzy Matching Tool can identify those two names and addresses as belonging to the same individual, thereby enabling the user to avoid having that individual's information duplicated due to those slight differences.  See id.

[11] Because the parties did not find out about the conference call until near the close of discovery, the call is not mentioned in the Amended Complaint.  Accordingly, May argues that he is entitled to summary judgment on this claim on that basis alone.  See May's Reply Supp. MSJ 18; see also Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 617 (4th Cir. 2009) ("[A] plaintiff may not raise new claims after discovery has begun without amending his complaint.").  Although May is likely correct, because the allegations regarding the conference call are similar in kind to the other allegations underlying IDM's misappropriation claims, it will be considered on the merits.

24

> I understand that the disclosure of information regarding . . . fuzzy matching techniques on the Alteryx platform was a disclosure of IDM confidential and proprietary information. Id. ¶ 13.

Defendants provide two declarations from Tobey.[12] In his first declaration, Tobey avers that Wiedower only explained "the basic functionality of Alteryx and its Fuzzy Matching Tool" and that the information Wiedower provided was "general in nature and was very similar to the information provided on Alteryx's public website or by using the templates provided in the software package." First Tobey Decl. ¶ 9. Tobey further avers that "at no time during this call do I recall ever discussing any customer data integration ('CDI') rules or ever discussing with Mr. Wiedower how IDM utilizes Altery[x]." Id. ¶ 13.

Assuming that Merkle's "company name matching problem" was a topic of conversation during the conference call, which Tobey denies,[13] defendants argue that IDM's failure to specifically identify what Wiedower disclosed is fatal to its claim. Specifically, defendants contend that merely stating the generic descriptor "fuzzy matching techniques" fails to identify any alleged confidential information or trade secret and therefore is not sufficient to create a triable issue of fact. See, e.g., May's Reply Supp. MSJ 18 ("Alteryx is a publicly-available data program and like any program such as Microsoft Word, PowerPoint or other programs, different users can have greater familiarity with a program's functionality. Thus, Mr. Wiedower's declaration that he helped solve an Alteryx problem provides no insight.").

---

[12] Because the parties did not become aware of this conversation until near the close of discovery, neither Wiedower nor Tobey were deposed.

[13] In his declarations, Tobey avers that they only discussed high level information relating to how to use Alteryx's Fuzzy Matching Tool and that he was not looking to resolve any particular problem Merkle was having. See Suppl. Decl. Joseph Tobey ("Suppl. Tobey Decl.") ¶¶ 3, 6-8 (July 16, 2015); First Tobey Decl. ¶¶ 9, 16.

Given that Wiedower is IDM's witness, and IDM chose to obtain a declaration from him, there is no reason why IDM could not have had Wiedower articulate in his declaration what proprietary IDM information regarding "fuzzy matching techniques" he disclosed to Tobey. Merely stating "information regarding . . . fuzzy matching techniques" does not provide enough evidence from which a reasonable jury could determine whether the disclosed information satisfies the ATSA definition of a trade secret and the Saforo factors, particularly because that term would seemingly cover the built-in functions of Alteryx's Fuzzy Matching Tool, which are publicly available to all who purchase that software.

Finally, May argues, "IDM does not show how Mr. May is liable for Mr. Wiedower's decision to reveal any confidential information during a call or how Mr. May could distinguish between what information resid[ed] in Mr. Wiedower's head that IDM considered confidential or not." Id. IDM has not cited any authority for its position that because May set up the telephone conference and was present during the call, he should be liable for anything improper Wiedower may have said. Therefore, IDM's trade secret misappropriation claim based on the telephone call between Wiedower and Tobey does not survive summary judgment.

### 3.  IDM's CDI for Blanking the Middle Name

IDM's next alleged trade secret relates to work that IDM and Merkle collaborate on for Dell, their mutual client. It is undisputed that Merkle houses Dell's Global Marketing Database ("GMDB") and IDM provides data to be entered into that database. See Pl.'s Opp'n Merkle's MSJ 6. In June 2014, Merkle discovered a problem with the way data contacts were being displayed in print-out form from the database for a particular marketing campaign. As a result of this discovery, an e-mail discussion ensued between Chris Treacy ("Treacy"), a Dell employee; various Merkle employees, including Carla Hatler ("Hatler"); and Janice Grayson ("Grayson"),

an IDM employee.  See MERKLE_0000159 ("Blank the Middle Name E-Mail").  The following

are the relevant portions of that e-mail exchange:

> **Merkle's Hatler to Dell's Treacy, IDM's Grayson, and other Merkle employees (June 12, 2014):** Chris,
> We discovered an issue with the data that was being printed on the July MMM—first name was being duplicated on the piece (e.g. Chris Chris Treacy). We made a judgment call and have asked RRD to stop printing and correct the issue, plus agreed to pay the $1,000 required to do so as we had to act very quickly. We are still investigating the root cause and will keep you posted. I will also provide details on how many pieces this impacted.
>
> **IDM's Grayson to Merkle's Hatler, Dell's Treacy, and other Merkle employees (June 12, 2014):** Thanks for the update Carla.  (And thank Jaimie for moving so quickly on this!)
>
> **Merkle's Hatler to IDM's Grayson, Dell's Treacy, and other Merkle employees (June 12, 2014):** Quick update:
> In home dates will not be impacted
> Still waiting for:
> 1. Root cause analysis (is this an issue with the way the data comes to us from Dell or is this a database processing issue and how do we fix?)
> 2. How many DM pieces were impacted (RRD to provide)
> Jaimie is working directly with RRD & Brad Matheny on # 2 above.
>
> **From Dell's Treacy (June 12, 2014):** Who is working on #1?
>
> **Merkle's Hatler to Dell's Treacy, IDM's Grayson, and other Merkle employees (June 12, 2014):** Sara Roberts is leading as Anant [Veeravalli] is out today (sick day)

Later that same day, Merkle's Hatler provided an update to Dell's Treacy.  IDM's Grayson was

not part of the continued e-mail exchange:

> **Merkle's Hatler to Dell's Treacy and other Merkle employees (June 12, 2014):** Chris,
> Below is a recap of what we have found & suggested remedies. . . .
> **Issue:** Source data comes in with first name populated and last name populated with first and last name. . . .
> **Source data:** We don't have percentages yet, but our research indicates sources are predominantly IDM and Member.
> **Remedy:**

1. We can alter the CDI code to blank out the middle name in KL if it is equal to the first name. Thomas [Russel] has already given the team approval to make this change.
2. In the meantime, we can set up all campaigns so that middle name is not populated in the mail file, only first and last name. Please confirm you would like us to implement this change.

**From Dell's Treacy (June 12, 2014):** . . . I agree with changing KL as that seems like a normal thing KL would do.

I would like an assessment by morning of how many and what the exact list is (not just idm).

I agree that we should never use middle name as that is not a standard output in direct mail. And fix the KL process to check for dupes [duplicates] like this.

**Merkle's Hatler to Dell's Treacy and other Merkle employees (June 13, 2014):** Chris, . . . Items we are investigating:
1. Confirm feeds where this occurs (we have confirmed this is an issue with latest IDM file) . . . .

**From Dell's Treacy (June 13, 2014):** . . . [W]e will need to know the list code if it's a specific list code. Have you engaged IDM to ask how that might be? . . .

**Merkle's Hatler to Dell's Treacy and other Merkle employees (June 13, 2014):** . . . If we have not engaged with IDM yet, we will and will include those details in our summary. . . .

**Dell's Treacy to Merkle's Hatler (June 13, 2014):** BTW—checking my emails, but Dennis and I worked on this exact issue when we were building the GMDB. This came up with address standardization. So hence why I thought it odd yesterday. You guys make [sic] want to ask Dennis.

At this point, it appears that Dell's Treacy forwarded the entire above e-mail exchange to May and then asked him the following: "Hey, bro. do you remember this from way back when? They are getting first name and dell feeds full name (with first). I remember long ago when we were dealing with address std we ran into this. Just so long ago, you were just starting." May responded to Treacy:

Yes, I do remember this with Arlene. My recollection was that a fix was put into place to blank the middle name in the occurrence that it matched the first name exactly. There WERE some instances where it didn't match exactly and those

were not blanked, but exact matches had the middle name blanked. I can try and find the Jira ticket for the team if that would be helpful.

Blank the Middle Name E-Mail.

IDM contends that May's response constituted a disclosure of a confidential CDI rule of IDM's that amounted to a trade secret. Defendants argue that May's four-sentence, high-level e-mail cannot constitute disclosure of a trade secret or confidential information because it does not rise to the requisite degree of sophistication and because the information he conveyed was not a secret. Specifically, Merkle argues that May's e-mail does not satisfy the two <u>Saforo</u> factors that take into consideration "the extent to which the information is known outside the business" and "the extent of measures taken by [plaintiff] to guard the secrecy of the information." <u>Wal-mart</u>, 66 S.W.3d at 630 (quoting <u>Saforo</u>, 991 S.W.2d at 120-21).

The information May conveyed to Dell's Treacy was clearly not a secret and was known by those outside of IDM. Before Treacy had forwarded the above e-mail exchange to May, Merkle employee Hatler had already suggested to Treacy the remedy of blanking out the middle names. <u>See</u> Blank the Middle Name E-Mail ("We can alter the CDI code to blank out the middle name in KL if it is equal to the first name. Thomas has already given the team approval to make this change."). Furthermore, in his deposition, Merkle employee Adam Mincham explained that "blanking a name is very common in CDI processing." <u>See</u> Mincham Dep. 85, 87. In addition, Slater, IDM's CEO, admitted in deposition that the "Jira ticket" May referenced was not anything recorded in an IDM system,[14] <u>see</u> Slater Dep. 84-85; rather, a Jira ticket is an electronic

---

[14] Specifically, Slater was asked:

> **Q:** What is the Jira ticket?
> **Slater:** I don't know. I don't know if it's a Dell ticket, if it's a Merkle ticket. I said it's a project management tool or ticket that refers to a problem.
> **Q:** Okay. But it's not an IDM ticket.
> **A:** Well, it's an IDM--he--no, it's not an IDM ticket.

record in Merkle's project-tracking software. See Mincham Dep. 75. Therefore, it is clear that

May was not referring to any of IDM's proprietary information or trade secrets in this e-mail.

Defendants further argue that even if the "blanking the middle name" fix constituted

confidential or trade secret information, it would belong to Dell under the SOW between Dell

and IDM. In contrast, IDM contends that this particular CDI solution belongs to IDM. The

parties rely on the language of the SOW, which states in relevant part:

> During the course of this SOW, IDM may prepare or provide certain deliverables
> for Dell (either independently or in concert with Dell or third parties) consisting
> of such things as reports, documents, templates, studies, software programs,
> (source code or object code), specifications, documentation, abstracts, and
> summaries thereof, and other work product and materials collectively referred to
> as "the Deliverables." IDM agrees that the Deliverables prepared for or provided
> to Dell under this Agreement shall constitute the work product of Dell (the "Dell
> Work Product") and are complete and full property of Dell.
>
> All pre-existing methodologies and processes that IDM owns prior to working
> with Dell remain the property of IDM. IDM licenses such relevant methodologies
> and processes used to perform services within this SOW to Dell and allow Dell to
> use, create and use derivatives of such, both globally and in perpetuity.

IDM000325.

Defendants argue that the blank-the-middle-name fix constitutes a "deliverable"

belonging to Dell. In support, they cite IDM's deposition, in which Slater admitted that the fix

was a deliverable. See IDM Dep. 200.[15] IDM argues that the fix constitutes a pre-existing

methodology or process owned by IDM and the deliverable referenced by Slater was the dataset

that resulted from the fix. IDM acknowledges, however, that any of its pre-existing

methodologies and processes used in the context of that SOW were licensed to Dell "in

---

Slater Dep. 84-85.

[15] Specifically:

> **Q:** So in other words, Dell hired you as sort of a deliverable fix this for us. We'll
> pay you for it?
> **IDM:** Yeah, that's one way to look at it, yes.

IDM Dep. 200.

perpetuity." See Pl.'s Opp'n Merkle's MSJ 16 ("[The SOW] specifies that all pre-existing

methodologies and processes of IDM remain IDM's property, with Dell being granted a license

on such information."). Therefore, even if, as IDM argues, the blank-the-middle-name fix was a

solution owned by IDM rather than a deliverable, Dell was licensed to use that solution and May

did not inform Dell (through Treacy) of any information to which Dell was not already privy.

Accordingly, IDM has not proffered sufficient evidence, in light of defendants' substantial

evidence on this point, from which a reasonable jury could find in its favor, and summary

judgment will be granted for defendants.

### 4. List of Potential Vendors for Samsung

IDM claims that May disclosed IDM trade secret information by providing to Merkle

employees the names of four IDM data vendors and an estimate of what those vendors might

charge in connection with a proposal Merkle was preparing to obtain work from Samsung. The

evidence related to this allegation is the following mid-May 2014 e-mail exchange[16] between

May and Merkle employees, including Mark Engelke ("Engelke") and Cathy MacDonald

("Macdonald"):

> **May to Engelke:** Have you leveraged any of the smartphone data sources or
> contract expiration sources with Samsung??
>
> **Engelke to May:** Hi Drew – Yes, we are in discussions around this with
> Samsung. Do you have any sources you recommend. I've added Harold, Amie
> and Cathy [to this e-mail] as they have been managing this work.
>
> **May to Engelke:** I'm sure you're already engaged with these sources, but want
> to make sure.
>     BMI Elite
>     One Source
>     Take 5
>     TNS Global Contract data

---

[16] Cited by the parties as the "May 16, 2014 Samsung Smartphone E-mail" or as
"MERKLE_0000119."

**MacDonald to May:** Hi Drew, We are definitely familiar with these vendors, but we are not currently using any for Samsung's campaigns. Do you have experience using these sources for email specifically? I know we have looked at several of these in the past and they were cost-prohibitive based on Samsung's usual price requirements, however if you have seen successful email campaigns using these we can take another look at these partners. (Emphasis added.)

**May to MacDonald:** I know there is a lot of e-mail quantity available and you could probably get pretty selective on segments Samsung is particularly interested in targeting. I've only had experience with these sources on a limited basis, however, I was aware they had universe available. What are Samsung's usual pricing requirements? My bet is you could get the wholesale price to be $30-35/CPM.

Two weeks later, Harold Schambach, another Merkle employee, asked MacDonald if she had looked into May's suggested sources yet. She responded:

We have not specifically explored them for recent campaigns, but we can reach out and see what they might have available. I can say though that Take 5 specifically we would probably not recommend, as we have recently had concerns about the quality of the data. But we can explore the others and see if they can meet Samsung's needs from a data and pricing standpoint, and we will include them in future recommendations if they are a fit.

May 16, 2014 Samsung Smartphone E-mail.

IDM argues that May's statements in the above e-mail exchange constitute a disclosure of IDM trade secret information because IDM expends considerable resources vetting potential data vendors, testing the quality of their data, and developing pricing models based off of the vendors' costs.[17] Defendants argue that the data vendors listed by May are publicly known companies and simply naming those companies cannot constitute disclosure of confidential information or a trade secret.

Citing to one unpublished case, IDM broadly argues that "[v]endor information . . . qualifies as a trade secret." Pl.'s Opp'n May's MSJ 22 (citing Illumination Station, Inc. v. Cook,

---

[17] To be clear, IDM does not argue that May actually disclosed such vetting methodologies or pricing models.

No. Civ. 07-3007, 2007 WL 1624458 (W.D. Ark. June 4, 2007)). Before the court in

Illumination was a motion to dismiss the tort claims in the plaintiff's complaint as preempted by

the ATSA. The court stated:

> The types of information allegedly misappropriated by the [defendants] can be grouped into several general categories, i.e., vendor information, product information, pricing information, manufacturer contact information, customer contact information, and "spreadsheets" whose content is unspecified. To the extent that Illumination Station [the plaintiff] made reasonable efforts to maintain the secrecy of such information, the Court believes that it qualifies as trade secrets under the ATSA. It is information that derives value from the fact that only Illumination Station and its agents know it and can use it to further the business objectives of Illumination Station.

Illumination, 2007 WL 1624458 at *3. IDM's reliance on Illumination ignores that court's

specific finding that the vendor information at issue, which was not specified, "derive[d] value

from the fact that only [the plaintiff] and its agents kn[e]w it," id., which is not the case for the

four vendors listed by May, as MacDonald responded that Merkle was "definitely familiar with

these vendors" and their general price offerings. See May 16, 2014 Samsung Smartphone E-

mail. Therefore, Illumination is not dispositive of this issue. As IDM has urged many times, the

determination of what qualifies as a trade secret is fact-specific; thus, to survive summary

judgment, IDM must point to sufficient evidence from which a reasonable jury could find that

May's list of four vendors revealed an IDM trade secret.

For evidence of the confidential and trade secret nature of the identities of the four

vendors listed by May, IDM relies solely on the deposition testimony of two IDM employees,

Rocky Beal ("Beal") and Frank Gangemi ("Gangemi"), and one Merkle employee, Marc Fanelli

("Fanelli"). The relevant portions of these depositions are as follows:

> **Q:** You also mentioned Samsung. What do you know about Samsung?
> **Beal:** Again, there was an inquiry from Merkle -- I can't recall who -- asking for lead sourcing and pricing for Samsung and Microsoft in which Drew responded

with specific sourcing types and price ranges that are directly related to our client pricing.

**Q:** Okay. And do you know anything about what you just testified to other than what you saw in the production, discovery production, document production from Merkle or IDM or Drew May?

**A:** No, it was in the Merkle production.

Beal Dep. 208-09.

**Q:** The Samsung opportunity is one of the opportunities you listed that you thought Mr. May may have done something inappropriate. What's your basis for believing that?

**Gangemi:** I believe that I had reviewed something that had talked about -- again, without having total recall of the entire discovery set -- either in a detailed way or a high level way, data vendors and pricing that were consistent with what we had done in the past for either Dell and/or Research in Motion, Blackberry.

Gangemi Dep. 182.

**Q:** . . . [C]ould you explain to me why Merkle and you spend the time and money to travel to South America to meet with all of these data vendors if it's all just commercially available on NextMark?

**Fanelli:** Sure. So domestically, pretty much everything is available on NextMark. There is some international data available there. These countries are all in different states of -- levels of maturity. We don't just vet the data vendors. We vet the laws, regulations, privacy, components of the market, legislation has been -- legislation around what you can do with marketing information is changing incredibly quick, in some of these places.

And that's part of -- when we talk about value add, that's part of about what we bring -- so you have to get, in our view, and again, we have been doing this since 2009, 2010. You have to get in market. You have to meet these companies. In some of the cultures, it's easier to do business with when you are -- if you've established face to face, but it's bigger and broader than understanding who the data vendors are, although that is the, that's the central focus.

But it's also how do we advise our clients on what they can or cannot do with that information in each country. That's one part of it. And the other is -- you know, the other would be what kind of channels or tactics or media and things are working. What are most -- what tactics are more effective from market to market. We get hired and paid for our international assessments that have nothing to do with sourcing data, but our knowledge of the market and the data landscape.

Fanelli Dep. 91-92. Nothing in any of these depositions provides evidence from which a

reasonable jury could find that May's e-mail constituted a disclosure of confidential or trade

secret information.

IDM's only other evidence appears in Slater's declaration, in which he avers that "though data vendors may be publicly searchable companies, their offerings are <u>not necessarily</u> publicly available, or even readily available in the industry—and the quality of the data is not available until purchased or tested." Slater Decl. Opp'n MSJ ¶ 20 (emphasis added). This statement provides no information about the four specific data vendors listed by May, provides no support for IDM's contention that the identities of those four vendors is a trade secret, and even acknowledges that some data vendors' offerings are publicly available.

Furthermore, in terms of the pricing information in May's e-mail, it is May's unrebutted testimony that he estimated the cost for those vendors based on his general knowledge of the market rather than any information he learned at IDM:

> **Q:** And did you also provide to Mark Engelke the pricing information regarding those phone data vendors?
> **May:** What I recall is I didn't provide him any pricing to Samsung. I gave him a general market estimate of what he or the data team could expect to pay for those.
> **Q:** And the general market estimate was information that you had from working at IDM?
> . . .
> **A:** I don't believe I ever saw any cost information at IDM for those services.

May Dep. 164. Therefore, there is no evidence that he used confidential or trade secret information in reaching his pricing estimate for the four vendors he listed.

Finally, IDM has not pointed to any evidence showing that Merkle used any of those four vendors in its work for Samsung; accordingly, there is no evidence that Merkle was unjustly enriched through use of any of IDM's vendor information. In addition, Samsung was never a customer of IDM; therefore, IDM has suffered no lost profits from Merkle's dealing with Samsung. In sum, IDM has not provided sufficient evidence from which any reasonable juror could find that May's identification of the above-four vendors, along with his statement that Merkle may be able to purchase the data it sought from these vendors at a cost of $30-35/CPM,

satisfies all of the criteria to qualify as a trade secret under the ATSA, nor has IDM shown any damages it could recover on this claim. Therefore, this claim does not survive summary judgment.

### 5. IDM's New Business Trigger Program

IDM also alleges that May improperly disclosed information about its New Business Trigger Program. IDM bases this claim on one e-mail exchange. In September 2014, IDM employee Grayson forwarded to Dell and Merkle an IDM "workflow" for a new project that IDM was doing for Dell, called the New Business Trigger program. An internal conversation between Merkle employees discussed the implications of this new IDM program for Merkle, as both IDM and Merkle were working for Dell. May's only input during this Merkle-employee e-mail exchange was: "But my point is, there are still suppressions, knocking out customers, etc. that have to be accounted for in the process. How is that going to happen? The flow Anant forwarded would assume IDM had all of those files & customers onsite to do the work. To my knowledge, that does not exist, so how is that data going to be accessed?" See September 8, 2014 New Biz Trigger Disclosure E-mail. Anant Veeravalli, a Merkle employee, responded, "Dell is going to send a weekly source file to IDM and Terry/Mike told me that this processing intelligence is going to be managed at IDM. Not sure how." Id.

IDM claims that May's e-mail statement "disclosed specifics about IDM's capacities to fellow Merkle executives based on his information gained while working at IDM." Pl.'s Opp'n May's MSJ 24. IDM provides no further explanation or support for why May's statement about IDM not having files and customers onsite revealed confidential or trade secret information. To the extent that IDM claims that May disclosed other information about its New Business Trigger program, IDM has cited no evidence to support that claim. In fact, Beal, IDM's Executive Vice President for Client Services, admitted in his deposition that IDM gained its New Business

36

Trigger work with Dell after May had already left IDM. See Beal Dep. 47-48. Moreover, it is May's unrebutted testimony that he did not know anything about that program. See May Dep. 439 ("**Q:** What is New Biz Trigger logistics? **May:** I have no idea."). Accordingly, IDM has not provided any evidence from which a reasonable jury could find that the contents of May's statement rise to the level of a trade secret under the ATSA.

### 6. May's Alleged Disclosures to Third Parties

In addition to arguing that May disclosed IDM information to Merkle, IDM contends that May disclosed IDM trade secrets to three additional parties: Todd Greer ("Greer"), an investor, see May's Dep. 218; Gerard Daher ("Daher"), the president and CEO of Speedeon Data LLC ("Speedeon"), which is a data vendor for IDM's "new mover program;" and Joy Garcia ("Garcia"), an employee of former-IDM client Stage Stores.

First, IDM asserts that May and Greer had "extensive discussions" about setting up a new business venture with Speedeon and, in April 2014, May met with Greer and Speedeon CEO Daher to further discuss their plans. See Pl.'s Opp'n May's MSJ 24 (citing May Dep. 223-24, 280). In preparation for that meeting, the following e-mail exchange occurred between May, Daher, and Speedeon employee Michelle Harness ("Harness"):

> **Daher to May (April 3, 2014):** Drew, . . . Lots of interesting things happening with your former employer. I think they are going to struggle moving forward at The Home Depot. We just came off some very strong meetings.
>
> One of the things I'd love you to think about is how we can collaborate on a business opportunity. We have huge data processing capabilities. Point being, there is not much need for you to buy a bunch of hardware, data center racks, etc. Speedeon has plenty of technology and capacity. Maybe we form a new entity that you own the majority and we are minority investors. Speedeon has world class marketing and sales infrastructure coupled with tremendous IT infrastructure.
>
> I think we can do some great things together and I'm glad you're out of Chad [Slater, IDM's CEO,] and Rocky's house of cards.
>
> **May to Daher (April 7, 2014):** Gerard,

Thanks for the note. I'm looking forward to visiting your new office location and getting a better sense of Speedeon's core value and offering coupled with your vision for the future.

I am in total agreement with your thoughts around our discussion regarding how we pursue a joint business opportunity. I'd want to better understand how you're positioning your data processing capabilities with your current and future clients. There are multiple ways we could structure a relationship, I'd like to focus on the business opportunity first then move to effectively structuring a relationship that works for both of us.

We can discuss more of the IDM situation when we're together!

Michelle Harness E-mail (May-000307). May forwarded this e-mail exchange to Harness, to

which she replied:

**Harness to May (April 8, 2014):** Got it. I'm sure he wants your input on what is occurring at IDM. As discussed, ask him to provide an example/application for database management and how it incorporates into Speedeon's current offerings. Where are the gaps he is trying to fill (by solution & revenue tied to it). . . .

Id. IDM characterizes the above e-mail as Harness telling "May that Daher would be interested

in May and Greer providing IDM information at the meeting to determine whether to invest in

Greer and May's business." Pl.'s Opp'n May's MSJ 23. This e-mail exchange does not provide

evidence from which a reasonable jury could conclude that May disclosed trade secret

information to Daher, nor does IDM explain what trade secret information it claims May

disclosed.

In late August and early September 2014, May and Greer were still in talks with

Speedeon about setting up a new business venture, which they had begun referring to as

"Junction Bridge."[18] See GREER 000823. To this end, May, Greer, and Daher held another

---

[18] IDM further asserts, without citing to any evidence, that "May has largely ignored IDM's discovery responses, where IDM listed that May included IDM solutions as Junction Bridge assets" and "outlined a business plan for Speedeon using IDM solutions." Pl.'s Opp'n May's MSJ 23. Discovery is over and IDM has no pending motion to compel against May. Therefore, because IDM fails to cite to any evidence of what the "IDM solutions" are that May allegedly utilized in connection with Junction Bridge or Speedeon, or how those solutions may constitute trade secrets, these claims fail.

meeting on September 4, 2014. See id. IDM asserts that "[i]mmediately after" that meeting,

"IDM's client The Home Depot (also a client of Speedeon's) inquired directly regarding IDM's

data-processing methodologies." Pl.'s Opp'n May's MSJ 24. In support of that assertion, IDM

cites only to one e-mail exchange between IDM employee Joel Lanphier ("Lanphier") and Home

Depot employee Phil Wheaton ("Wheaton"), for which the subject line reads "New Mover

Results - August 2014 Update." The exchange is as follows[19]:

> **IDM's Lanphier to Home Depot's Wheaton (September 5, 2014):** Hey Phil,
> Below are the NM results with response and AOS included.

> **Home Depot's Wheaton to IDM's Lanphier (September 5, 2014):** Joel,
> How do we handle overlap between lists? Do we randomly allocate
> dupes? Do you have any reports that show the overlap?

> **IDM's Lanphier to Home Depot's Wheaton (September 6, 2014):** Hi Phil,
> Yes the weekly merges are random so that we can fairly evaluate all
> sources. Speedeon has pushed us several times to make them top priority in the
> merge, but we continue with random to make sure there is a level playing field.
> We do have interaction reports that show us the overlap with each source.
> In fact this is one of the reports that is now available because of the switch in
> processing from RRD to IDM. Do you want me to send you that report after next
> week's merge?

IDM fails to explain what the connection is between Wheaton's question to IDM, which was

apparently in direct response to an e-mail from IDM's Lanphier, and the meeting between May,

Greer, and Daher. IDM also fails to explain how Wheaton's question provides any evidence that

May disclosed any IDM trade secrets to anyone.

IDM further asserts that it "received a similar methodology-inquiry e-mail from Joy

Garcia shortly after contact with May." Id. That email from Garcia to IDM employee Beal

stated, "Can you confirm which 3 sources of SOW data we currently have available to us?"

April 7, 2014 e-mail from Garcia to Beal. IDM fails to explain how Garcia's one-sentence e-

---

[19] IDM cites this e-mail exchange as "Wheaton-Lanphier e-mail of Sept. 5, 2014."

mail provides evidence showing that May disclosed IDM trade secrets to Garcia. See Pl.'s Opp'n May's MSJ 23-24.

Lastly, IDM contends that May disclosed trade secret information to Greer in relation to yet another potential business venture the two worked on together, called Data Co. Specifically, IDM asserts that "[t]he sales plan of Data Co[.] is identical to the sales plan of IDM's retained by May on his hard drive, i.e., Data Co[.]'s sales plan is a virtual carbon copy of IDM's sales plan, right down to the formatting and text. (Ball Report.)" Id. at 24. Despite this assertion, Slater was unable to identify the IDM document at issue during his deposition as IDM's corporate designee. See May's MSJ 20-21 (citing IDM Dep. 344).[20] Given that Slater apparently had no knowledge of the document, and that IDM has not even provided the document as an exhibit to its opposition briefs, IDM has failed to produce any evidence from which a reasonable jury could find that the document qualified as a trade secret under the ATSA and applicable Saforo factors. Moreover, IDM has not provided any evidence that Data Co. was ever formed or ever received any revenue; therefore, IDM cannot point to any damages or unjust enrichment from any misappropriation of this document.

### 7. Circumstantial Evidence of "Other" Misappropriation

During the August 21 hearing, in response to the Court's inquiry regarding exactly what trade secrets IDM believed were misappropriated, IDM's counsel argued that it should not be limited to the specific instances of alleged misappropriation discussed above:

---

[20] Specifically, Slater gave the following testimony:
> **Q:** Have you ever seen this document before?
> **IDM:** I don't believe so, no.
> **Q:** Has this compensation plan ever been utilized by IDM, to your knowledge?
> **A:** No. I --
> **Q:** Sorry --
> **A:** Even more to the point, IDM is not familiar with ever seeing this document before.

IDM Dep. 344.

**IDM's Counsel:** Mr. May took everything, Your Honor, as he testified when he was here before. We are entitled under the law to prove our case on the basis of circumstantial evidence.

We have given you the items of direct evidence that we've seen, but we believe that the jury is entitled on this record to draw inferences of circumstantial evidence that Mr. May took all of our confidential, proprietary, and trade secret information on his, on his laptop and brought it with him to Merkle for the express purpose, as you've seen, to steal our clients and to F us, that they have covered up the information by spoliating information, by submitting a false affidavit, and therefore, we don't think, Your Honor, that we need to limit the record to those specific instances.

We have those specific instances, any one of which we think -- all of which we think there is enough material issues in dispute to defeat summary judgment, any one of which could send this case to the jury, but aside from those five, six, or seven items that we have specifically identified, we believe that the jury is entitled to draw the inference that since, since Mr. May stole everything, since the documents indicate that he was hired specifically for Google and for Dell, immediately billable to Google and to Dell, as you've seen, that he was put on those projects . . . .

Tr. Aug. 21 Hr'g 5-6.

**The Court:** All right, so the -- what you're telling the Court, though, your theory of what is a trade secret in this case is everything.

**A:** I'm not saying that -- that's not correct, Your Honor.

**The Court:** Well, you just said -- I said I was trying to find out exactly what are the trade secrets, if this case were to go to trial, what are the trade secrets that the jury would be presented with that they would have to decide had been misappropriated or not.

**A:** Okay.

**The Court:** And there are five that are specifically addressed in your papers, but you just said to me those are not the only five, and what I want to know is what are the other specific trade secrets?

**A:** There are many. There's the Shopper ID program. There's the New Mover program. They're all listed in, in our interrogatory answers. There is, there is a list of them that were stolen by Mr. May. He stole the Shopper ID program. He stole the New Mover program.

**The Court:** But do you have evidence in this record that the Shopper ID program has been used by Merkle? Do you have evidence of that?

**A:** No, Your Honor.

**The Court:** All right. Do you have evidence that any of the other programs other than the five that I mentioned have actually been used by Merkle?

**A:** I have, I have only the evidence that I've given to you with respect to what they have used. What I am suggesting to you, that there are many other items that Mr. May stole. I'm not saying that everything on the hard drive that he stole is trade secret information. There are other elements on the hard drive that Mr. Slater testified to that we answered in interrogatories that were stolen that are trade secret. They are listed, for example, in our interrogatory answers when we list our damages.

Id. at 9-10.

Essentially, it is IDM's position that May and Merkle should be liable for all of the IDM information retained on May's hard drive regardless of the lack of evidence that any of that information was a trade secret and the lack of evidence that any information was passed on to Merkle or used by May, Merkle, or third parties to their benefit. Although circumstantial evidence can be sufficient to survive summary judgment, in this case, it is not, particularly in light of how weak the direct evidence discussed above is. IDM has had many months of discovery in this matter and still cannot point to direct or circumstantial evidence that May or Merkle actually used and benefitted from particular confidential or trade secret information belonging to IDM.

Lastly, IDM contends that it may establish defendants' liability on the trade secrets claims based on the doctrine of "inevitable disclosure," under which "a plaintiff may prove a claim of trade-secret misappropriation by demonstrating that a defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." Cardinal Freight Carriers, Inc. v. J.B. Hunt Transp. Servs., Inc., 987 S.W.2d 642, 646 (Ark. 1999). Specifically, IDM argues that the

Court should find that May would inevitably disclose IDM trade secrets by virtue of his employment with Merkle on accounts that were directly competitive with IDM, such as Google and Dell. See Pl.'s Opp'n May's MSJ 20.

May responds that "the mere fact a person assumes a similar position at a competitor does not, without more, make it inevitable that he will use or disclose trade secrets." May's Reply Supp. MSJ 8 (quoting Bendinger v. Marshalltown Trowell Co., 994 S.W.2d 468, 475 (Ark. 1999)). For example, in Cardinal Freight, inevitable misappropriation was found based on specific evidence that the plaintiff's former employees' new employer, Cardinal, "had no compunction about using or disclosing information covered under [the plaintiff's] confidential agreement to gain an unfair competitive advantage." Cardinal Freight, 987 S.W.2d at 647. The evidence showed "that (1) Cardinal's president said that he would approve telling customers where Cardinal is better than [the plaintiff], and would approve comparing [the plaintiff's] future plans and operational capabilities; and (2) Cardinal or its employees expressed an intention to exploit the holes in [the plaintiff's] program (software)." Id. IDM has provided no such evidence of bad faith on Merkle's part. Moreover, to receive the benefit of the inevitable disclosure doctrine, a plaintiff must still identify information qualifying as a trade secret that will be inevitably disclosed, which IDM has not done. See ConAgra, Inc. v. Tyson Foods, Inc., 30 S.W.3d 725, 731 (Ark. 2000) (reversing trial court's grant of an injunction based on a finding of inevitable disclosure because the information to be disclosed did not qualify as a trade secret).

For these reasons, summary judgment will be granted to May and Merkle on IDM's misappropriation of trade secrets claims, respectively Counts IV and V.

## E. Conversion

The conversion claim in Count III alleges that May converted IDM's confidential and proprietary information. In his Motion for Summary Judgment, May challenged Count III as

preempted by the Arkansas Trade Secrets Act. The Court has already concluded that the ATSA does not preempt claims that are not based upon misappropriation of trade secrets and has already found that IDM did not produce sufficient evidence from which a reasonable jury could find that any of the information specifically identified by IDM constitutes a trade secret. Therefore, Count III is not preempted.

May also argues that there is insufficient evidence of damages under Arkansas law.[21] "The proper measure of damages for conversion of property is the market value of the property at the time and place of the conversion." Elliott v. Hurst, 817 S.W.2d 877, 881 (Ark. 1991). IDM responds that it has provided "evidence of financial information, with expenses incurred in labor and development, and supporting documents with calculations for the previous five years." Pl.'s Opp'n May's MSJ 29. In support, IDM cites to four pages of its deposition testimony and to Plaintiff's Third Supplement to Its Objections and Responses to Defendant Drew May's First Interrogatories to Plaintiff ("Third Supplemental Responses").

---

[21] IDM appeared to vaguely argue that the law of another state governs the conversion claim but did not specify which state. See Pl.'s Opp'n May's MSJ 18 ("[T]he ATSA only acts to preempt Arkansas common-law claims; it would have no effect on claims cognizable under other states' common laws . . . . Thus, the ATSA does not work as a blanket prohibition on all tort claims, including, but not limited to, claims for wrongful interference, conversion, breach of fiduciary duty, or acts where the wrong occurred outside Arkansas. Similarly here, IDM has claimed tortious interference regarding May's solicitation of Stage Stores and Google and breach of his IDM Agreement which is governed by Virginia law and not Arkansas law." (citation omitted) (emphasis in original)). In contrast with its earlier argument, IDM relied on an Arkansas case in support of its argument that it has produced sufficient evidence of damages for its conversion claim. See id. at 29 (citing Pro-Comp Mgmt., Inc. v. R.K. Enterprises, LLC, 272 S.W.3d 91, 95 (Ark. 2008)).

Given that during the time he worked for both IDM and Merkle, May lived and worked in Arkansas, and that any conversion of IDM's property occurred in Arkansas, Arkansas law is the proper law to govern the conversion claim. See Airlines Reporting Corp. v. Pishvaian, 155 F. Supp. 2d 659, 667 n.9 (E.D. Va. 2001) ("Under Virginia's choice of law rules, a tort claim is to be governed by the law of the place of the wrong, the lex loci delicti. And, in Virginia, it is well-settled that the place of the injury supplies the governing law in tort actions." (citations omitted)).

In its Third Supplemental Responses, IDM listed its damages in four separate categories without tying any particular damages to any particular count in the Amended Complaint. The only category of damages that would relate to the conversion claim is the category of "value and development costs."[22]  See Pl.'s Third Suppl. Resp. 6. IDM explained its value and development costs as follows:

> IDM's damages include the value and cost of development of its trade secrets which May and Merkle have stolen, $46.73 million, based on the time and effort spent, and expenses incurred, in developing its proprietary solutions over the preceding five years, as follows: Global Data Footprint ($6,200,000); Lead Gen Solution/Process ($8,000,000); CDI/cCRM ($14,700,000); Ad Agency Footprint ($3,800,000); Ad Spend/Laidlaw ($9,200,000); Hi-Tech Install FP ($780,000); Retail Capture/Shopper ID ($1,750,000); New Mover Program ($2,300,000).

Id. In the version of the Third Supplemental Responses produced to the Court, there are no calculations demonstrating how the above amounts were determined.[23]

The portions of the four deposition pages cited by IDM as evidence of damages are as follows:

> **Q:** For Global Data Footprint you have attributed that amount of money of the cost of development as $6,200,000. How specifically did you compute that value?
>
> **IDM:** You know, it goes back to all the time. Time, travel, people working on, everything else. My best estimate of what it is that we've spent on developing that process in that case or expertise that we get paid by our clients for.
>
> **Q:** What documents did you refer to when you came up with that amount?
>
> **A:** All the documents that I've given you. I mean, we've got some -- you know, there's many, many different ways that you can kind of get to this. I mean, I've

---

[22] The other three damages categories are: (1) lost profits from Stage Stores and Google; (2) reasonable royalties, which would only be permissible under certain circumstances if defendants were found to have violated the ATSA; and (3) unjust enrichment.

[23] Rather than attaching its Third Supplemental Responses to its own opposition brief, IDM relies on the version that May attached in support of his motion for summary judgment [Dkt. No. 227-1]. That version does not include any "supporting documents with calculations for the previous five years." Presumably, therefore, such calculations were never produced despite IDM's statement to the contrary.

got probably three or four kind of informal business advisors; right? And it's one of those things that you learn over time of -- I always looked at it as like we're trying to solve a problem, and what it really is is R&D costs on our IP; right? Which is now how we track it and expense it, but that is a relatively recent, you know, process for us, and I've got to go back to the beginning of, you know, 10, 11 years to estimate what these numbers are. So what I did is hours spent, people's time spent, travel, calenders [sic], etc. to come at these numbers of these development costs.

IDM Dep. 127-128.

**Q:** What number did you ascribe to your time from a per-hour basis?

**A:** The number I used for my hourly basis that was one single factor and not X times this many hours is roughly about $3,500 an hour.

**Q:** $3,500 per hour?

**A:** Yes.

**Q:** What was the next highest number that you used when you were calculating any of the numbers set forth in value and development costs or development cost on page 4 of Exhibit 1?

**A:** Well, it's the development the next highest number, off the top of my head, it goes through our Replicon system, and we assign value based on people's overall compensation. I don't remember what it is off the top of my head; right? But I know what people are paid, and so I can come up with an hourly rate, but again, it's you know, an estimation; right? What's Rocky Beal's hourly rate if his, you know, number of-- he doesn't work 2,080 hours a week -- or a year; right? So what's his hourly rate value? I don't know. There's a number that I came up with as part of that system, but I don't recall exactly what it is.

IDM Dep. 235-36. Nothing in IDM's depositions or its Third Supplemental Responses provides sufficient evidence upon which a reasonable jury could calculate the market value of any converted information, as opposed to IDM's roughly estimated development costs.

Although it does not appear that IDM has produced sufficient evidence from which a reasonable jury could calculate the market value of any of its confidential and proprietary information with reasonable certainty, actual damages are not an essential element of conversion

under Arkansas law.[24]  See Elliott, 817 S.W.2d at 880 (defining conversion as "any distinct act of

dominion wrongfully exerted over property in denial of, or inconsistent with, the owner's right").

A finding of a lack of actual damages does not preclude a finding of liability for conversion.

See, e.g., Schmidt v. Stearman, 253 S.W.3d 35, 43 (Ark. App. 2007) ("[T]he jurors in this case,

if they gave credence to the [defendant's] return of the property, were constrained to fill out their

verdict form in favor of [the plaintiff] on conversion but award a reduced amount, possibly zero,

in damages. The return of property could not support the jury's outright finding in favor of [the

defendant], which amounts to a finding that no conversion took place."); see also Manhattan

Credit Co. v. Skirvin, 311 S.W.2d 168, 170 (Ark. 1958) ("We hold . . . since there was a

conversion and, consequently, an invasion of appellee's rights, he is entitled to nominal damages

which we fix at $10."); Barlow v. Lowder, 35 Ark. 492, 493 (1880) ("It is doubtless true that

some damages are always presumed to follow from the violation of any right, and therefore the

law will in such cases award nominal damages, if none greater be proved."). Therefore, IDM's

conversion claim will go forward, but the evidence of actual damages will be stricken as there is

insufficient evidence in this record to support any actual damages.[25]  Accordingly, IDM will only

be entitled to nominal damages and injunctive relief if the jury finds in its favor on Count III.

---

[24] Indeed, May apparently recognizes that damages are not a necessary element of conversion
under Arkansas law, as he did not list conversion along with the other causes of action that
require damages. See May's MSJ 22-23 & n.8 (listing only breach of contract, breach of
fiduciary duty, and tortious interference as having damages as an element).

[25] Although the liability part of IDM's conversion claim survives summary judgment, the Court
notes its reservations that taking electronic data could support a claim for conversion under
Arkansas law. See Infinity Headwear & Apparel, LLC v. Coughlin, 447 S.W.3d 138, 143 (Ark.
App. 2014) ("To the extent it asks us to create a new cause of action for the conversion of
electronic data, we decline to do so."). May did not raise this argument as a basis for summary
judgment and no party has briefed the issue; therefore, the conversion claim will go forward for
now.

## F.  **Breach of Fiduciary Duty**

In Count II of the Amended Complaint, IDM alleges that "May breached his fiduciary duties to IDM by misappropriating and disclosing IDM's confidential information." Am. Compl. ¶ 73.  No further description of this allegedly wrongful conduct is provided in Count II. Nevertheless, in its memorandum opposing May's Motion for Summary Judgment, IDM characterizes its breach of fiduciary duty claim in an entirely different manner by describing the breach as May's "setting up competing data-marketing tech companies while still employed, using IDM's computers, using IDM's Little Rock offices, and attempt[ing] to 'poach IDMers' [i.e., IDM employees]." Pl.'s Opp'n May's MSJ 25 (citations omitted).

As May properly argues, it is well settled that "a plaintiff may not raise new claims after discovery has begun without amending his complaint." Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 617 (4th Cir. 2009).  There is no indication in Count II that IDM intended to include a claim for breach of fiduciary duty based on setting up competing enterprises, and there is no mention of May attempting to set up such enterprises anywhere in the Amended Complaint. Furthermore, IDM has not sought to amend the complaint to add such a claim based on any evidence it received during or after discovery.  Therefore, any claim of breach of fiduciary duty based on May's attempts to start competing business ventures fails.

Even if IDM had sought leave to amend its breach of fiduciary duty claim based on its newly-asserted allegations, that claim would be meritless because there is no evidence that May actually set up any competing businesses or stole any IDM employees and, therefore, there is no evidence that IDM has been damaged or that May has been unjustly enriched based on that conduct.[26] See Giroir v. MBank Dallas, N.A., 676 F. Supp. 915, 919 (E.D. Ark. 1987) (stating

---

[26] For example, IDM asserts that Greer and May "discussed establishing a competing data services and processing company, Junction Bridge," and that "Junction Bridge was incorporated,

the elements of breach of fiduciary duty as "the existence of a fiduciary relationship between the

parties, a breach of the defendant's duty to the plaintiff within that relationship, and the resultant

damages to the plaintiff" (citing Raines v. Toney, 313 S.W.2d 802, 808-10 (Ark. 1958))); see

also Golden Tee, Inc. v. Venture Golf Sch., Inc., 969 S.W.2d 625, 631 (Ark. 1998) (plaintiffs'

failure to allege individual injuries resulting from defendant's breach of fiduciary duty, among

other reasons, caused that claim to fail). By the same reasoning, the breach of fiduciary duty

---

a development website built, and May worked on a business plan for Junction Bridge." Pl.'s
Opp'n May's MSJ 24 (citing May Dep. 223-25). These assertions are not fully supported by the
portion of May's deposition testimony to which IDM cites:

> **Q:** Did you do any work for Junction Bridge or in connection with Junction
> Bridge?
> **May:** Can you define work?
> **Q:** Yes. Was Junction Bridge ever incorporated?
> **A:** Todd [Greer] may have incorporated it. I don't know that to be a fact.
> **Q:** Were you involved in that?
> **A:** The incorporation?
> **Q:** Yes.
> **A:** I don't remember. No. I don't --
> **Q:** Did you do a business plan for Junction Bridge?
> **A:** We were working on pitch decks for Junction Bridge. We were working on
> some pro formas, some presentations. Things like that as potential things for
> Junction Bridge.
> **Q:** Did you refer to any IDM information in connection with the projects that you
> did for Junction Bridge?
> **A:** Not that I recall, no.
> **Q:** . . . [A]re you aware of there being a website for Junction Bridge?
> **A:** There was a development website for Junction Bridge.
> **Q:** Was it ever put up on the internet?
> **A:** Not that I'm aware of. No.
> **Q:** What do you mean by development website?
> **A:** Meaning it was a work in progress, or process, I guess, to potentially have a
> website developed.

May Dep. 224-25. This testimony provides insufficient evidence from which any reasonable
jury could find that May actually set up, as opposed to merely discussed and began to set up, a
competing company while still employed at IDM. IDM has not presented evidence that Junction
Bridge was ever incorporated, that the development website was ever put online, or that there
were any further steps taken to begin that company. Further, there is no evidence that May or
Greer used any IDM information during their preparations or that either received any benefit
from beginning to set up Junction Bridge.

claim as it is stated in the Amended Complaint also fails because IDM has not cited to any evidence showing either that it suffered actual damages or that May was unjustly enriched by misappropriating or disclosing any IDM confidential information. See Pl.'s Opp'n May's MSJ 19.

### G. Intentional Interference with Business Expectancies

In Count VI of the Amended Complaint, IDM alleges "that there is a reasonable certainty that, absent May and Merkle's improper and intentional misconduct as set forth above [in the Factual Allegations section], including May's breach of his Confidentiality Agreement, IDM would have realized the expectancy of future business with Google, Dell, Stage Stores, and other clients." Am. Compl. ¶ 104. The only other IDM clients referenced in Count VI are J.C. Penney and Exclusive Resorts. See id. ¶¶ 101-02. In opposing summary judgment, IDM appears to have limited Count VI to its theory that May proximately caused Stage Stores to cease doing business with IDM by introducing Stage Stores to another entity, Infogroup's YES Lifecycle Marketing ("Infogroup" or "YLM"), which Stage Stores then began doing business with in lieu of IDM. See Pl.'s Opp'n May's MSJ 25-26; Pl.'s Opp'n Merkle's MSJ 29. IDM points to no evidence in the record of any tortious interference with respect to its other named clients, and none of the Stage Stores allegations involved conduct by Merkle, even though Merkle is included as a defendant in that count.

IDM asserts that Virginia substantive law governs Count VI. See Pl.'s Opp'n Merkle's MSJ 29 n.22. "In Virginia, [c]ourts have listed the elements of a prima facie case of tortious interference with prospective business advantages and relationships as (1) The existence of a valid business expectancy with a probability of a future economic profit; (2) Defendant's knowledge of the expectancy; (3) A reasonable certainty that absent the defendant's misconduct,

the plaintiff would have realized the expectancy; and (4) Damage to the plaintiff." [27] Stone
Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co., 191 F. Supp. 2d 652, 660 (E.D. Va. 2002)
(internal quotation marks omitted). "When a claim for tortious interference involves a business
expectancy, "the plaintiff must show that the defendant's actions were improper." Id. (internal
quotation marks omitted). "Under Virginia law, misuse of inside or confidential information, or
breach of a fiduciary relationship, constitute improper actions." Id. (internal quotation marks
omitted).

IDM's allegation that May improperly caused Stage Stores to cease doing business with
IDM rests solely on a series of e-mails between Stage Stores employee Garcia and May, as well
as e-mails between Garcia and Beal, IDM's Executive Vice President of Client Services[28]:

**May to Garcia (March 19, 2014):** Yes,[29] so that's the e-mail side (Yesmail) of
InfoGroup and Michael Fisher would be engaged. He is very well respected.

**Garcia to May (March 21, 2014):** Oh good! I haven't heard that name yet, so
that's good!
       What's new with you? Any updates/progress???

**May to Garcia (March 22, 2014):** Not too much to report. I am onsite at Merkle
the first week of April. We're also working on finalizing a business plan for our

---

[27] May, by citing only to Arkansas case law in his briefs, appears to take the position that
Arkansas law should govern IDM's intentional interference claim. The Court need not decide
whether Virginia or Arkansas substantive law applies because the result is the same under both.
See Vowell v. Fairfield Bay Cmty. Club, Inc., 58 S.W.3d 324, 329 (Ark. 2001) ("To establish a
claim of tortious interference, appellee must prove: (1) the existence of a valid contractual
relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the
part of the interfering party; (3) intentional interference inducing or causing a breach or
termination of the relationship or expectancy; and (4) resultant damage to the party whose
relationship or expectancy has been disrupted. We also require that the defendant's conduct be
at least 'improper.'" (citations and footnote omitted)).
[28] The first two e-mail exchanges are attached to IDM's opposition to Merkle's motion for
summary judgment, and IDM cites to them as "3-22-14 LifeCycle marketing e-mail" and "4/8/14
Question e-mail." The final exchange is attached to IDM's opposition to May's motion for
summary judgment, and IDM cites to it as "4-23-14 Catch-Up e-mail."
[29] Although it appears that May is responding to a question, no earlier e-mails in this e-mail
exchange between May and Garcia have been provided by any party.

own data services company. We've made a lot of progress. No finalization of separation from IDM.

Kelly Kennedy also could be involved with the Lifecycle stuff. She used to run sales at Merkle.

I hope you are well. Once something is finalized I'll let you know.

**May to Garcia (Monday, April 7, 2014, at 10:44 PM):**  What did you decide to do on the marketing database/data management platform work?

**Garcia to May (April 8, 2014):**   Hi!! Good to hear from you. I think we're 99.9% decided, but it's not going to be IDM. :(  Of all the folks that presented after you, YLM did an amazing job connecting the technology and strategy pieces together, and they have an ESP and a digital engine already integrated, so I think we're going with them. Haven't told Rocky since we're going through the Legal due diligence now, but I'll circle back with him shortly.

So…..what's going on in your world? I've thought about you a ton, and am excited to see what you're up to!

PS…are you still involved with the DMA?[30]

**Beal to Garcia (April 23, 2014):** . . . Two other quick questions… it sounded like you had to run.[31] 1. Who did you end up going with re: your database? 2. Have you heard from Drew and/or are you working with him? Just curious…

**Garcia to Beal (April 23, 2014):** . . . In looking back over the database proposals, we strongly like YLM.  Haven't signed anything yet, but we've been going through some discovery discussions and I'm feeling good.   They were significantly lower in cost, and already have the ESP and DSP rolled into their base platform, so it feels like a good fit.  Ever working with him and/or heard anything about them?  I haven't heard from Drew….did he land somewhere or is he opening his own database business?

In response, Merkle has submitted an affidavit from Garcia which contains the following

relevant statements:

> Prior to some point in the Fall of 2014, Stage Stores was in a contractual relationship with IDM. Under this contract, IDM supplemented a customer database hosted by a third party by providing consumer demographic data, consumer psychographic data, and cooperative share of wallet data. Once Stage Stores ceased using this particular data base, IDM's Services were no longer needed, as Stage Stores no longer needed a company like IDM to provide supplemental work under the new database constructed by Infogroup, as discussed below.  Garcia Aff. ¶ 3.

---

[30] This is the final e-mail between Garcia and May that has been produced.

[31] This e-mail appears to be a follow up from a telephone conversation between Beal and Garcia.

In early 2014, in lieu of maintaining a consumer database through the third party provider, Harte Hanks, Stage Stores decided to build out a new database by a new provider and migrate the information contained on the Harte Hanks database to this new database. Id. ¶ 4.

In furtherance of Stage Stores' plan to build out this database, Stage Stores sent out a request for proposal to a number of companies, including IDM. A request for proposal was never sent to Merkle, however, nor was Merkle ever considered for this project. Id. ¶ 5.

Ultimately, Stage Stores decided to accept the proposal from Infogroup to assist in building this database. Id. ¶ 6.

I was a member of the committee that ultimately decided upon which company to choose to construct this database. IDM was considered but was rejected for the following reasons:
> a. The cost proposed by IDM for the project was too high;
> b. IDM did not offer an integrated product, meaning the database which would have been  constructed by IDM would not have an integrated DSP (digital service platform) or ESP (email service platform) into the database. A failure to fully integrate a DSP or ESP into the database would require Stage Stores to hire an additional company to supplement the database in the event it selected IDM. Hiring an additional company to provide DSP or ESP also provided more security risk, as Stage Stores files would need to move through more parties. Id. ¶ 7.

While Drew May was still employed by IDM, I informed him that Stage Stores decided not to accept IDM's proposal. Id. ¶ 9.

Although Drew May and I had a telephone conversation or two after he left IDM, we never discussed IDM during these conversations and Drew May never told me any information relating to IDM. Id. ¶ 10.

IDM first argues that Garcia's affidavit is contradicted by the e-mail exchange because,

"contrary to paragraph 10 of her affidavit, Garcia not only spoke to May regarding IDM business

after his termination from IDM, but Garcia first learned of [Infogroup]—the company to which

IDM lost Stage Store's [sic] database business—from May himself while he was 'onsite at

Merkle' to finalize his deal." Pl.'s Opp'n to May's MSJ 25.  The content of the e-mails reveals

that Garcia and May discussed May's departure from IDM and Stage Stores' decision regarding

which company to choose to "build out" its new database. Those conversations do not constitute discussions "regarding IDM business." Moreover, even if May had introduced Stage Stores to Infogroup, IDM has not cited any authority supporting a claim that such conduct was improper, given that May was no longer an employee of IDM on the date of his first e-mail to Garcia.

IDM next argues that Garcia's affidavit cannot be taken at face value because, "contrary to paragraph 9 of her affidavit, Ms. Garcia informed May that Stage Stores rejected IDM's business after his termination from IDM and upon direct questioning by May." Id. at 26 (emphasis in original). Although it is true the parties have stipulated that May's employment was terminated on March 11, 2014 (the date when Slater informed him of his termination), there was a period of time following March 11 during which IDM and May were winding down their relationship. For example, IDM offered May a Confidential Separation and Release Agreement, which he declined to execute, IDM had May's office belongings packed up and delivered to his home, and May told Garcia in his March 22 e-mail that his separation from IDM was not yet finalized. Any disagreement over whether Garcia told May about Stage Stores' decision before or after his employment with IDM ended is based purely on semantics and, in any case, is immaterial because IDM has not cited any authority showing that it was in any way improper for May to ask Stage Stores which company it chose to build its database, regardless of whether or not he was still employed by IDM.

Lastly, IDM attempts to dispute Garcia's affidavit by stating that "Garcia did not actually inform IDM until two weeks later, on April 23, 2014, that Stage Stores chose YLM and IDM had lost the business, and falsely told IDM that 'I haven't heard from Drew.... did he land somewhere or is he opening his own database business.'" Id. There is no evidence that Garcia's statement that she had not heard from May is false, given that the last produced communication between

the two of them had occurred two weeks earlier and May still had not been able to tell her at that point whether he would be joining Merkle or starting his own business. Once again, IDM cites no authority for why it would be improper on May's part for Garcia to have informed him of Stage Stores' decision before informing IDM.

Overall, the e-mails cited by IDM corroborate, rather than call into question, Garcia's stated reasons for Stage Stores' decision to choose a company other than IDM for its new database work. Drawing all reasonable inferences in IDM's favor, nothing in any of these e-mails provides any direct or circumstantial evidence of misconduct on May's part or casts doubt on the accuracy of Garcia's affidavit, and none of IDM's arguments provide a basis upon which any reasonable juror could find that May improperly interfered in any IDM business expectancy.

The sole basis for IDM bringing this identical intentional interference claim against Merkle is that May told Garcia that he would be onsite at Merkle during the first week in April, and then May inquired as to Stage Stores' decision on Monday of the second week of April. IDM fails to present any evidence that Merkle had any connection to Stage Stores. Because this claim is clearly meritless, defendants will be awarded summary judgment on Count VI.

### H. Unjust Enrichment Claim and Other Relief Sought

In the final count in the Amended Complaint, Count VII, IDM alleges that by "improperly using IDM's proprietary and confidential information to compete against IDM, May and Merkle have been unjustly enriched." Am. Compl. ¶ 108. Specifically, IDM alleges that defendants have knowingly "received value and retained the value of the confidential and proprietary information obtained from IDM without just compensation," under circumstances in "which May stole and passed on IDM's information to Merkle," thereby rendering it inequitable for defendants to retain the benefit of IDM's information without paying value for it. Id. ¶¶ 109-11. The elements of a cause of action for unjust enrichment are "(1) a benefit conferred on the

defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; and (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc., 299 F. Supp. 2d 565, 576 (E.D. Va. 2004); see also Robinson v. Fountainhead Title Grp. Corp., 447 F. Supp. 2d 478, 493 (D. Md. 2006) (same); Hatchell v. Wren, 211 S.W.3d 516, 522 (Ark. 2005) ("[A]n action based on unjust enrichment is maintainable where a person has received money or its equivalent under such circumstances that, in equity and good conscience, he or she ought not to retain.").[32]

Aside from the information discussed in the context of the trade secrets claims, IDM has not identified any other specific information that May or Merkle are alleged to have used to their monetary benefit. Therefore, Count VII fails for all the reasons stated above with respect to the information underlying IDM's trade secrets claims, most notably because IDM has not provided sufficient evidence from which a reasonable jury could find that May or Merkle knowingly used any trade secret or confidential IDM information to benefit themselves. To the extent that IDM argues that it is entitled to relief on its other counts based on an unjust enrichment theory of damages, that argument fails as well for all the reasons stated in the discussion of those counts.

In opposing summary judgment, IDM argues for the first time that May has been unjustly enriched by his salary from Merkle because, IDM contends, Merkle hired May in large part because of his knowledge of IDM information. IDM cites no authority for the proposition that

---

[32] IDM argues that Maryland law governs its unjust enrichment count as to Merkle and does not specify which state's law governs as to May. Merkle argues that Virginia law governs the claim against it, and May argues that Arkansas law governs the claim against him. Regardless of the choice of law issue, the outcome is the same because the elements of an unjust enrichment cause of action are substantially the same in all three states.

an individual's salary can constitute unjust enrichment and, in any case, Merkle pays May a lower salary than he received from IDM.

IDM also argues that summary judgment cannot be granted on the issue of unjust enrichment while its Motion to Compel Merkle to produce financial information relating to Merkle's profits from certain clients remains pending. Because none of IDM's claims against Merkle can survive summary judgment, no additional discovery into Merkle's financial information is appropriate. For this reason, IDM's pending Motion to Compel will be denied.

Finally, because the Court has already found that summary judgment is appropriate in favor of Merkle on all counts against it, the remainder of the parties' damages arguments with respect to those counts need not be addressed. For the same reason, IDM is not entitled to any injunctive relief against Merkle. Similarly, because summary judgment will be granted in May's favor on all counts except for conversion, the parties' remaining damages arguments with respect to the other counts need not be addressed. In addition, the only forms of relief IDM may receive against May depending on the outcome of trial are nominal damages and injunctive relief relating to the conversion claim.

### III. IDM'S SPOLIATION MOTION AND MOTION FOR SANCTIONS

Also pending before the Court are IDM's Spoliation Motion and Motion for Sanctions. In its Spoliation Motion, IDM argues it is entitled to, among other remedies, judgment by default or, alternatively, an adverse inference that both May and Merkle misappropriated and used IDM's confidential and trade secret information based on May's deletion of IDM files from his external hard drive on four separate dates: July 16, September 7, September 19, and September 22, 2014. IDM also seeks the imposition of a monetary fine and reimbursement of its costs in engaging its forensic computer expert and in preparing its Spoliation Motion.

In its Motion for Sanctions, IDM seeks sanctions against both defendants for failure to produce certain documents in discovery, defense counsels' improper instructions to May not to answer certain deposition questions, and May's submission of a false affidavit to the Court. The sanctions sought by IDM include "judgment by default or, in the alternative, an adverse inference instruction, plus a monetary fine, and an award of attorneys' fees and costs to IDM for preparing this motion." Pl.'s Mot. Sanctions 26. In addition, IDM requests "that May be compelled to answer questions at his deposition that he refused to answer" and that the Court "review in camera any and all versions of May's affidavit as indicated on the privilege log of Merkle." Id. Both motions are fully briefed and on June 26, 2015, an evidentiary hearing was held, during which May testified and oral argument was heard on both motions. At the conclusion of the hearing, the Court made a finding that at least one of the statements in May's affidavit was false but declined to otherwise rule on the motions.[33] See Tr. Spoliation & Sanctions Mots. Hr'g 39-41 (June 26, 2015).

The following facts are relevant to IDM's motions and are essentially uncontested or uncontestable. On Friday, September 5, 2014, IDM CEO Slater called Patrick Hennessey ("Hennessey"), Merkle's President of Vertical Markets, to inform him that he was filing suit against May on Monday, September 8, 2014. IDM filed its original Complaint as planned on September 8, and May was served on September 10, 2014. On Sunday, September 7, May deleted from his external hard drive the folder ("F:\drewmay\2013 & 2014 IDM Budget") and 574 files that Ball, plaintiff's forensic computer expert, asserts consisted primarily of IDM business data. See Ball Rep. 9.

---

[33] The Court had vigorously encouraged the parties, all of whom work in a highly competitive business environment, to settle this dispute, especially given that IDM and Merkle have worked together on projects, such as servicing Dell. The delay in ruling fully on these motions was motivated by the hope that the parties would settle.

On September 9, IDM filed a motion for a temporary restraining order ("TRO") and a preliminary injunction and also filed a motion for limited expedited discovery. On September 17, in opposing IDM's motion for a TRO and preliminary injunction, May submitted an affidavit in which he averred, "I did not keep any of IDM's information from that laptop or from any other source." May Aff. ¶ 9 (Sept. 17, 2014). Two days later, the parties appeared before a district judge for a hearing on IDM's motion for a TRO and then appeared before a magistrate judge for a hearing on IDM's motion for limited expedited discovery. At both hearings, May's then-counsel (who is no longer representing May) agreed to turn over May's external hard drive so that IDM could inspect it and determine whether it held any confidential IDM information. See Tr. TRO Mot. Hr'g 19-20, 28 (Sept. 19, 2014); Tr. Exp. Discovery Mot.Hr'g 11, 14 (Sept. 19, 2014). In addition, at the TRO hearing, May's counsel represented that "[f]ollowing [May's] separation from IDM, he realized that he still had that external hard drive. He reviewed it. He removed any personal items from it and he wiped it. He does not have that data any more." Tr. TRO Mot. Hr'g 19. On the same day as those hearings, May deleted 37 more files, including IDM business data. Ball Rep. 9. Three days later, on September 22, May deleted another 12 files, several of which contained IDM information. Id. May ultimately produced forensic images of his hard drive to IDM a few days after making the final deletion on September 22.

At the conclusion of the June 26 hearing, after hearing May's testimony and considering the evidence of the deletions that occurred so close in time to the submission of May's affidavit, the Court found that May's statement that he "did not keep any of IDM's information" was false.[34] The Court now finds that May's submission of that false statement is sanctionable. In

---

[34] Specifically, the Court stated: "[T]he clear statement that I did not keep the records is just not accurate. Mr. May did keep them, and he still had some of them at the time he filled out that affidavit. So I do find that there's a false statement in that affidavit, and whether it's the fault of

addition to being sanctionable, May's lack of candor regarding his retention of IDM files, coupled with his inflammatory text messages regarding stealing IDM's clients and employees, poisoned the well for settlement purposes and caused unnecessary additional litigation, including necessitating IDM filing both its Spoliation Motion[35] and Motion for Sanctions. Accordingly, IDM will be awarded the costs associated with hiring its forensic computer expert, as well as its reasonable attorneys' fees and costs in preparing and prosecuting its Motion for Sanctions. All other relief requested in those motions will be denied.

## IV.  CONCLUSION

For the reasons stated above, Merkle's Motion for Summary Judgment will be granted in full, rendering IDM's Motion to Compel Merkle to produce additional financial information moot, and judgment will be entered in Merkle's favor on all counts (Counts V, VI, and VII). In addition, May's Motion for Summary Judgment will be granted as to Counts II (breach of fiduciary duty), IV (violation of the Arkansas and Virginia trade secrets acts), VI (intentional interference with business expectancies), and VII (unjust enrichment), and judgment will be entered in May's favor on those counts. May's Motion for Summary Judgment will be denied as

---

Mr. May or his counsel, ultimately he signs it, and he's an intelligent man and is expected to read things and to read them honestly and carefully." Tr. Spoliation & Sanctions Mots. Hr'g 39 (June 26, 2015).

[35] Although it is clear May attempted to delete IDM information from his hard drive, he did not destroy the relevant evidence, which plaintiff's forensic computer expert was able to retrieve. See Ball Rep. 9 (stating that "most" of the files deleted on September 7 "were IDM business data," that the 37 files deleted on September 19 included "IDM business data," and that the 12 files deleted on September 22 included "several IDM data"); see also Ackert Decl. ¶ 3 (June 18, 2015) (May's forensic computer expert, Julian Ackert, asserting he was able to recover all of the files deleted on September 19 and 22, including their metadata). Therefore, there is insufficient evidence to support a finding of spoliation and IDM's Spoliation Motion will therefore be denied.

to Count III, the conversion claim, and the parties may proceed to trial on that count alone.[36]

Lastly, IDM's Motion for Sanctions will be granted in part only as to the one false statement in

May's affidavit, and its Spoliation Motion will be denied. An appropriate Order consistent with

these rulings will be issued with this Memorandum Opinion.

Entered this $\underline{8}$ day of September, 2015.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

---

[36] Also pending before the Court is May's Motion to Strike Declarations and Other Materials ("Motion to Strike"), in which May moves to strike certain materials IDM relies upon in its opposition to May's Motion for Summary Judgment on hearsay and other grounds; however, much of the information May seeks to strike could be presented at trial in an admissible form. See Fed. R. Civ. P. 56(c)(2). Moreover, striking any of the information at issue would not affect the summary judgment analysis in this Opinion. Therefore, the Motion to Strike will also be denied by an appropriate Order.